WEST MICHIGAN ENVIRONMENTAL ACTION COUNCIL v
NATURAL RESOURCES COMMISSION

Docket No. 60800. Argued May 3, 1978 (Calendar No. 6).—Decided
    February 20, 1979. Rehearing denied 406 Mich 1121. Certiorari
    denied by the Supreme Court of the United States November 5,
    1979.
    The Department of Natural Resources sold a number of oil and
        gas leases in the Pigeon River Country State Forest, in the
        northern Lower Peninsula, and granted Shell Oil Company,
        Amoco Production Company, and Northern Michigan Explora-
        tion Company a number of oil drilling permits. The Depart-
        ment of Natural Resources then submitted to the Natural
        Resources Commission a management plan for the state forest
        which provided for limited oil and gas development, and com-
        pleted an Environmental Impact Statement with respect to the
        plan. The Natural Resources Commission and the oil companies
        negotiated a "Stipulation Consent Order" which adopted the
        limited development plan. The West Michigan Environmental
        Action Council and the Pigeon River Country Association
        moved to intervene in the proceeding before the Natural Re-
        sources Commission, and the motion was denied. These and
        other interested groups then brought an action for injunctive
        relief under the Environmental Protection Act. The Ingham
        Circuit Court, Thomas L. Brown, J., permitted the oil compa-
        nies to intervene as defendants. While the case was pending,
        the Supervisor of Wells, pursuant to the consent order, granted
        ten permits to drill exploratory wells. The plaintiffs sought a
        preliminary injunction restraining drilling under these permits,
        which was denied. The Court of Appeals denied relief on appeal
        of this denial, but ordered an expedited trial. After trial, the
        circuit court granted judgment for the defendants. The plain-
        tiffs appealed prior to decision of the Court of Appeals and the
        Supreme Court granted an injunction pending disposition of the
        appeal. In an opinion by Justice Blair Moody, Jr., with Justices

REFERENCES FOR POINTS IN HEADNOTES
[1, 5, 6] 38 Am Jur 2d, Gas and Oil §§ 100, 101.
    61 Am Jur 2d, Pollution Control § 181.
[2, 3] 61 Am Jur 2d, Pollution Control §§ 118-120.
[4] 61 Am Jur 2d, Pollution Control §§ 79, 119.

Williams, Fitzgerald, and Ryan concurring, the Supreme Court *held:*

I. The question of the likely effects of the ten exploratory wells was properly before the trial court.

II. The trial court erred in deferring to the conclusions of the Department of Natural Resources as to the likelihood of impairment of natural resources rather than exercising his own independent judgment.

III. The evidence adduced conclusively demonstrates that the drilling of the ten exploratory wells will likely result in an impairment or destruction of elk, and the plaintiffs have thereby made out a prima facie case under the environmental protection act. Therefore it is appropriate to enjoin permanently the drilling of the ten exploratory wells pursuant to the permits granted by the Supervisor of Wells on August 24, 1977.

1. The record below is unclear as to what conduct of the defendants is alleged as being likely to pollute, impair, or destroy natural resources, and, specifically, whether the action of the Supervisor of Wells in granting ten permits for exploratory wells after the suit was brought was a part of such conduct. Part of the confusion resulted from the plaintiffs' failure to amend their complaint to attack the validity of the permits after they offered to do so at a pretrial conference. Nonetheless, all parties presented evidence on the likely effect of drilling the ten wells and the trial court chose to address the issue of the likelihood of pollution, impairment, or destruction from their drilling. The consent order contemplated the issuance of the ten permits. The plaintiffs' allegation that the consent order is likely to lead to pollution, impairment, or destruction of natural resources can fairly be said to include within it an allegation that the issuance of permits for drilling test wells will have such a result, and the issuance of the permits was properly before the trial court as conduct alleged to be likely to pollute, impair, or destroy natural resources.

2. The trial court's deference to the conclusion of the Department of Natural Resources that no pollution, impairment or destruction of natural resources was likely to result from the contemplated drilling was erroneous. The court had a responsibility under the environmental protection act to make an independent, *de novo* determination. The usual standards for review of administrative actions under the Administrative Procedures Act are inapplicable once an action under the environmental protection act has been filed in circuit court: the environmental protection act provides not only that the court in which suit under the act is brought retains jurisdiction even

if it remits the parties to administrative proceedings, but also that the court has a responsibility to adjudicate and determine whether adequate protection from pollution, impairment, or destruction has been afforded. Courts can discharge their responsibility to make such determinations only if they make independent, *de novo* judgments. The purpose of the environmental protection act would not be accomplished if the courts were to exempt administrative agencies from the strict scrutiny which the protection of the environment demands. The trial judge erred in failing to exercise his own totally independent judgment; however, there is no need for a remand because the Supreme Court concludes that a judgment in favor of the plaintiffs is required on the record presented:

3. The defendants in this case have not raised any affirmative defenses under the environmental protection act, but have rested their case on a denial that the plaintiffs have made the prima facie showing required under the act. There is little, if any, dispute that the drilling of exploratory wells will have some adverse effect upon some wildlife, particularly elk, bobcat and bear. New roads would have to be built to six of the ten proposed sites, and elk avoid roads even when there is no traffic. Seismic survey work, which precedes exploratory drilling to determine whether oil might be in an area, occurs over less time than exploratory drilling and yet, apparently, may result in an absence of the elk so extended that it is uncertain whether they will return to the Pigeon River Country State Forest. Exploratory drilling obviously exacerbates this problem. An unknown number of the elk will not survive oil and gas development of the area, according to the environmental impact statement. That statement also predicts an adverse effect on bobcats and bears. The trial judge conceded that the exploratory drilling would have an adverse effect upon wildlife. However, he concluded that this did not constitute impairment or destruction of a natural resource because such results are commonly the result of wildlife management decisions. This determination reveals a fundamental misconception. If nature is allowed to pursue its own course, the growth and expansion of some species will inevitably result in the diminution and possible extinction of others. In a situation where an adverse effect will occur naturally unless some action is taken, it is a management decision to determine whether the natural processes should proceed or whether, through human intervention, the adverse impact should artificially be shifted to other species. The choice is not whether an adverse impact will occur but, rather, upon what. In contrast, if oil or gas development

does not take place, the oil and gas will not be adversely affected. But if such development does take place, wildlife is adversely affected. Thus, the choice is whether or not *any* adverse effect on natural resources will be allowed. Virtually all human activities can be found to adversely affect natural resources in some way or other. The real question before the Court is, when does such impact rise to the level of impairment or destruction?

4. In light of the limited number of elk, the unique nature and location of this herd, and the apparently serious and lasting, though unquantifiable, damage that will result to the herd from the drilling of the ten exploratory wells, the defendants' conduct constitutes an impairment or destruction of a natural resource.

The judgment of the circuit court is reversed and the case is remanded to the trial court for entry of a permanent injunction prohibiting the drilling of the ten test wells.

Justice Levin, joined by Chief Justice Coleman and Justice Kavanagh, dissented from the disposition. They would vacate the judgment of the trial court and remand to it for further proceedings, retaining jurisdiction.

1. It is unclear whether the trial judge deferred to the conclusion of the DNR that no pollution, impairment, or destruction of natural resources was likely to result from the contemplated drilling, but his comments are subject to that construction. Such deference would constitute error. A judge has a responsibility under the Environmental Protection Act to determine independently whether pollution, impairment, or destruction is likely to occur. The usual standards of review under the Administrative Procedures Act are inapplicable.

2. There is evidence, in the light of the limited number of elk and the unique nature and location of this herd, that the defendants' conduct in drilling the exploratory wells may impair or destroy a natural resource. However, Justice Levin refrained from stating whether the plaintiffs made a prima facie case under the Environmental Protection Act for the reasons given next.

3. At the trial, it was unclear whether the conduct alleged as likely to pollute, impair, or destroy natural resources was or should be treated as limited to the effects of the consent order or whether it included the effects of issuing ten permits to drill exploratory wells for oil and gas. The plaintiffs did not amend their complaint to specifically attack the validity of the permits, although the judge indicated that he would allow such an

amendment. As a result, there was uncertainty at the trial whether the propriety of issuing the permits themselves was properly in issue. The plaintiffs' allegation that the consent order is likely to lead to pollution, impairment, or destruction of natural resources can fairly be said to include within it the effect of issuing permits for the test wells, but the defendants may have been denied an opportunity to present evidence on the issue by a belief, shared by the judge, that the effect of test drilling was not in issue. The judgment of the trial court should be vacated and the cause remanded for further proceedings, with jurisdiction retained in the Supreme Court.

OPINION OF THE COURT

1. HEALTH AND ENVIRONMENT — ENVIRONMENTAL PROTECTION ACT — PLEADING — ISSUES RAISED.

An allegation in a complaint brought under the Environmental Protection Act that a consent order between the defendants, the Natural Resources Commission and several oil companies, is likely to lead to pollution, impairment, or destruction of the natural resources in a state forest area can fairly be said to include within it an allegation that the issuance of permits for drilling test wells will have that result, where the consent order contemplated that test wells would be drilled.

2. HEALTH AND ENVIRONMENT — ENVIRONMENTAL PROTECTION ACT — ADMINISTRATIVE PROCEEDINGS — APPEAL AND ERROR.

The Environmental Protection Act requires that independent, *de novo* determinations be made by a court upon review of administrative proceedings in environmental matters; the usual standards for review of administrative actions under the Administrative Procedures Act do not apply, and it is error for the reviewing judge to defer to the conclusions of the administrative agency rather than to make an independent determination (MCL 24.201 *et seq.*, 691.1201 *et seq.*; MSA 3.560[101] *et seq.*, 14.528[201] *et seq.*).

3. HEALTH AND ENVIRONMENT — ENVIRONMENTAL PROTECTION ACT — APPEAL AND ERROR.

The Supreme Court need not remand a case brought under the Environmental Protection Act in which the trial judge erred by deferring to the conclusion of the Department of Natural Resources rather than exercising his own totally independent judgment where a judgment in favor of the plaintiffs is required on the record presented.

4. Health and Environment — Environmental Protection Act —
   Destruction of Natural Resources.

   A determination by a trial court that a conceded adverse effect on
   wildlife of exploratory oil and gas drilling did not constitute
   impairment or destruction of a natural resource because such
   adverse effects are commonly the result of management deci-
   sions, and likening it to cutting trees to improve deer habitat
   or destroying the entire fish population of a lake or stream to
   plant more acceptable fish revealed a fundamental misconcep-
   tion; it is a management decision to determine whether a
   natural process which has an adverse effect on wildlife should
   be allowed to proceed or whether the adverse effect should be
   shifted artificially to other species through human intervention,
   to make the choice not whether an adverse effect will occur,
   rather upon what, but the choice in allowing exploratory
   drilling is whether or not *any* adverse effect on natural re-
   sources will be allowed.

5. Health and Environment — Environmental Protection Act —
   Oil and Gas Wells — Destruction of Natural Resources —
   Animals — Evidence.

   Plaintiffs seeking to enjoin the drilling of ten exploratory oil and
   gas wells in a state forest under the Environmental Protection
   Act demonstrated a likelihood of impairment or destruction of
   natural resources, specifically of elk, where the evidence
   showed that the state forest was the habitat of the only sizable
   elk herd east of the Mississippi River, that drilling the ten
   wells would have an adverse effect upon some wildlife, particu-
   larly elk, bobcat and bear, that service roads would have to be
   built to six of the ten sites and that elk avoid roads even when
   there is no traffic, that seismic survey work would drive the elk
   away and it is uncertain whether they would return, that the
   size of the herd and available habitat are shrinking, and that
   the result of further shrinkage of the habitat by exploratory
   activities would be that an unknown number of elk would not
   survive (MCL 691.1201 *et seq.;* MSA 14.528[201] *et seq.).*

Dissenting Opinion by Levin, J.

See headnotes 1, 2, and 4.

6. Health and Environment — Environmental Protection Act —
   Pleading — Issues Raised.

   *A case brought under the Environmental Protection Act to enjoin
   implementing a consent order between the defendants, the
   Natural Resources Commission and several oil companies,*

*should be remanded to the trial court for further proceedings where, at trial, it was unclear whether the issue of the effect on the environment of granting drilling permits for ten test wells was properly before the court because the plaintiffs did not amend their complaint to specifically attack the validity of the permits although the judge had indicated he would allow the amendment, and, as a result, the defendants may have been denied an opportunity to present evidence on the issue of likely impairment or destruction of natural resources by the drilling because of a belief, shared by the judge, that the effect of test drilling was not in issue.*

*Roger L. Conner* for plaintiffs.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Stewart H. Freeman* and *Thomas F. Schimpf,* Assistants Attorney General, for the defendants.

*Foster, Swift, Collins & Coey, P.C.* (by *Richard B. Foster, Webb A. Smith,* and *Terence V. Lynam),* for intervening defendants Shell Oil Company, Amoco Production Company, and Northern Michigan Exploration Company.

Amici Curiae:

*James M. Olson* for Environmental Law Society of University of Michigan Law School and Public Interest Research Group in Michigan.

BLAIR MOODY, JR., J. The issue is whether plaintiffs have made a prima facie showing under the Michigan environmental protection act, MCL 691.1201 *et seq.;* MSA 14.528(201) *et seq.,* that the drilling of ten exploratory wells in the Pigeon River Country State Forest will constitute a likely impairment or destruction of natural resources. We hold:

I) that the question of the likely effects of the

ten exploratory wells was properly before the trial court;

II) that the trial judge erred in deferring to the Department of Natural Resources conclusions as to the likelihood of impairment of natural resources rather than exercising his own totally independent judgment;

III) that the evidence adduced at trial conclusively demonstrates that the drilling of the ten exploratory wells for which permits have been granted will likely result in an impairment or destruction of elk. Plaintiffs have thereby made out a prima facie case under MCL 691.1203(1); MSA 14.528(203)(1).

We reverse and remand to the trial court for entry of a permanent injunction prohibiting the drilling of the ten exploratory wells pursuant to permits issued on August 24, 1977.

## FACTS

In 1968 the Department of Natural Resources (DNR) sold oil and gas leases covering 546,196.89 acres of state-owned land, including 57,669 acres in what is now known as the Pigeon River Country State Forest (Pigeon River Forest or Forest). Since that time, 19 oil and gas wells have been drilled in the Forest, five of which have been and are now producing wells.

Over a period of years, various plans to provide for controlled oil and gas development in the Forest were considered by the DNR. A management plan (the "limited development plan"), allowing oil and gas development in the southern one-third of the Forest while prohibiting development in the northern two-thirds, was submitted by the Director of the DNR, Howard Tanner, to the Natu-

ral Resources Commission (NRC). The DNR was asked to prepare an Environmental Impact Statement with respect to this management plan. In December, 1975, the Environmental Impact Statement (EIS) was completed.

The DNR then commenced negotiations with oil companies holding leases in the Forest in an attempt to have them agree to the development scheme set forth in the proposed management plan. On June 11, 1976 the NRC entered into an agreement entitled "Stipulation Consent Order" with Shell Oil Company, Amoco Production Company, and Northern Michigan Exploration Company. The consent order adopted the limited development plan allowing oil and gas development in the southern one-third of the Forest, subject to certain enumerated conditions and restrictions.[1]

The West Michigan Environmental Action Council (WMEAC) and the Pigeon River Country Association (PRCA) filed a motion to intervene in *In the Matter of Hydrocarbon Development in the Pigeon River Country State Forest* and moved for a hearing to be held on the June 11, 1976 consent order. On August 13, 1976 the NRC rejected this motion on the basis that it was premature and should properly be granted only when permits were applied for.

On June 12, 1977 Shell Oil Company applied for permits to drill ten exploratory wells in the limited development region. On August 24, 1977 the Supervisor of Wells granted these permits.

On September 17, 1976 plaintiffs filed the com-

---

[1] Similar consent orders were later negotiated with Sun Oil Company, Michigan Consolidated Gas Company, Getty Oil Company, and Chevron Oil Company, such that the only oil and gas lease in the Forest not covered by a consent order was that for Corwith 1-22, the subject of litigation in *Michigan Oil Co v Natural Resources Commission,* 406 Mich 1; 276 NW2d 141 (1979).

plaint in this action under the Michigan environmental protection act claiming that the consent order was entered into unlawfully and was likely to lead to the impairment of wildlife in the Forest. Plaintiffs sought an order restraining the state from issuing any permits to drill for oil and/or gas in the Forest or from implementing the June 11, 1976 consent order.

On December 5, 1977 the court rendered its final decision against plaintiffs and denied a motion for a stay and/or injunctive order pending appeal.

On December 7, 1977 an appeal was filed in the Court of Appeals. The Court of Appeals denied plaintiffs' motion for an injunctive order pending appeal on December 15, 1977. The following day plaintiffs filed an application for leave to appeal with this Court and requested an injunction pending that appeal. On December 22, 1977 this Court granted the injunctive request. 402 Mich 836 (1977). Later, on January 5, 1978 we granted the motion for an appeal prior to decision by the Court of Appeals. 402 Mich 845 (1978).

I

The record below is unclear as to what conduct of defendants is alleged as being "likely to pollute, impair or destroy the air, water or other natural resources or the public trust therein". MCL 691.1203(1); MSA 14.528(203)(1). Specifically, it is uncertain whether the action of the Supervisor of Wells in granting ten permits on August 24, 1977 to drill exploratory wells for oil and gas was a part of such conduct.

Part of the confusion resulted from plaintiffs' failure to amend their September, 1976 complaint

to specifically attack the validity of the permits issued in August, 1977, despite their offer to do so at an October, 1977 pretrial conference, As a result, there was uncertainty in the proceedings below as to whether the validity of the permits was ever properly put in issue before the court.

Nonetheless, all parties presented evidence on the likely effect of the drilling of the ten wells. Furthermore, the trial court chose to address the issue of the likelihood of pollution, impairment or destruction from the drilling activities contemplated by the ten permits.

We conclude that the issuance of the permits to drill ten exploratory wells was properly before the circuit court as conduct alleged to be likely to pollute, impair and destroy the air, water or other natural resources or the public trust therein. The effects of these permits were comprehensively treated at the trial level, both by the parties and by the circuit judge. Further, the consent order, which the trial court recognized was designed to be a "legally enforceable" document, stated that "[a]s many as ten test wells may be drilled for verification of seismic information. Specific drilling locations for these wells shall be determined by the oil companies and the director in consultation with the Public Service Commission".

Therefore, plaintiffs' allegation that the consent order is likely to lead to pollution, impairment or destruction of the natural resources of the Pigeon River Country State Forest can fairly be said to include within it an allegation that the issuance of permits for drilling test wells will have such result, the issuance of these permits being an inevitable consequence of the adoption of the consent order.

## II

Plaintiffs allege that the trial court deferred to the DNR's conclusion that no pollution, impairment or destruction of the air, water or other natural resources or the public trust therein was likely to result from the contemplated drilling. Plaintiffs claim that such deference constituted error by the trial court and that the court had a responsibility to independently determine whether such pollution, impairment or destruction would occur. We agree that the trial court so erred.

While we understand the trial judge's reluctance to substitute his judgment for that of an agency with experience and expertise, the Michigan environmental protection act requires independent, *de novo* determinations by the courts.

The act declares that "[p]rinciples of burden of proof and weight of the evidence generally applicable in civil actions in the circuit courts shall apply to actions brought under this act". MCL 691.1203(1); MSA 14.528(203)(1). Furthermore, the Legislature specifically addressed the relationship between suits brought under the environmental protection act and administrative proceedings:

"(2) If administrative, licensing or other proceedings are required or available to determine the legality of the defendant's conduct, the court may remit the parties to such proceedings which proceedings shall be conducted in accordance with and subject to the provisions of Act No. 306 of the Public Acts of 1969, being sections 24.201 to 24.313 of the Compiled Laws of 1948. In so remitting the court may grant temporary equitable relief where necessary for the protection of the air, water and other natural resources or the public trust therein from pollution, impairment or destruction. In so remitting the court *shall retain jurisdiction of the action pending completion thereof for the purpose of*

*determining whether adequate protection from pollution, impairment or destruction has been afforded.*

"(3) Upon completion of such proceedings, the court *shall adjudicate the impact* of the defendant's conduct on the air, water or other natural resources and on the public trust therein in accordance with this act. In such adjudication the court may order that additional evidence be taken to the extent necessary to protect the rights recognized in this act.

"(4) Where, as to any administrative, licensing or other proceeding, judicial review thereof is available, *notwithstanding the provisions to the contrary of Act No. 306 of the Public Acts of 1969, pertaining to judicial review, the court originally taking jurisdiction shall maintain jurisdiction for purposes of judicial review."* (Emphasis supplied.) MCL 691.1204; MSA 14.528(204).

Additionally, § 5 of the act states in relevant part:

"(2) In any such administrative, licensing or other proceedings, *and in any judicial review thereof,* any alleged pollution, impairment or destruction of the air, water or other natural resources or the public trust therein, *shall be determined, and no conduct shall be authorized or approved which does, or is likely to have such effect* so long as there is a feasible and prudent alternative consistent with the reasonable requirements of the public health, safety and welfare." (Emphasis supplied.) MCL 691.1205; MSA 14.528(205).

The above sections provide that the court in which suit is filed retains original jurisdiction of the matter, even if it chooses to remit parties to administrative proceedings. Moreover, the court has a responsibility to "adjudicate" and "determine" whether "adequate protection from pollution, impairment or destruction has been afforded". Courts can discharge their responsibility to make such determinations only if they make independent, *de novo* judgments. In fact, MCL

691.1204(4); MSA 14.528(204)(4), specifically indicates that the usual standards for review of administrative actions under the Administrative Procedures Act, MCL 24.201 *et seq.;* MSA 3.560(101) *et seq.,* are inapplicable once an environmental protection act case has been filed in a circuit court. The environmental protection act would not accomplish its purpose if the courts were to exempt administrative agencies from the strict scrutiny which the protection of the environment demands.

Shortly after the environmental protection act was passed, its chief legislative sponsor stated that "[u]nder the new statute, courts may inquire directly into the merits of environmental controversies, rather than concern themselves merely with reforming procedures or with invalidating arbitrary or capricious conduct".[2]

The Court has previously acknowledged:

"In the final analysis the very efficacy of the EPA will turn on how well circuit court judges meet their responsibility for giving vitality and meaning to the act through detailed findings of fact." *Ray v Mason County Drain Commissioner,* 393 Mich 294, 307-308; 224 NW2d 883 (1975).

Therefore, we conclude that the trial judge erred in failing to exercise his own totally independent judgment. We find, however, no need to order remand because we conclude that a judgment in favor of plaintiffs is required on the record presented.

### III

Defendants in this case have not sought to raise any affirmative defenses under MCL 691.1203(1);

---

[2] Press release, *Michigan Passes Landmark Environmental Law,* July 2, 1970, State Representative Thomas Anderson.

MSA 14.528(203)(1), but, rather, have rested their case on a denial that plaintiffs have made a prima facie showing that the conduct of defendants has, or is likely to pollute, impair or destroy the air, water or other natural resources or the public trust therein. We find that plaintiffs have demonstrated a likelihood of impairment or destruction of natural resources, specifically of elk, as a result of the proposed drilling of ten exploratory wells.

There is little, if any, dispute that the drilling of the exploratory wells will have some adverse impact upon some wildlife, particularly elk, bobcat and bear. The trial court found that "[t]here appears to be no question that adverse impacts will be visited upon particularly the elk, and to some lesser extent, bear and bobcat. * * * It is clear that an adverse impairment of the herd is likely for some unknown period to some unknown degree".[3]

---

[3] The record supports this finding.

Gary Boushelle, the DNR wildlife biologist who approved the ten sites, agreed that there would be a "severe adverse environmental effect for some wildlife species". E. Ford Kellum, a wildlife biologist and a former employee of the DNR, stated that Unit 1 of the Forest, in which the exploratory drilling is to occur, has "unique, almost endangered species, elk, bear and bobcat, osprey and a bald eagle, of which this was the center of where it looked like if they were going to survive the human race it's gonna' be here". Mr. Kellum testified that his experience at Charlton 1-4 and other wells led him to the observation that once drilling occurred in an elk habitat the elk no longer returned there.

Mr. Ned Caveney, the area forester in charge of the Forest, stated that it has been necessary to restrict snowmobiles in the Forest, even though each snowmobile represented only a temporary intrusion, in order "to improve and increase favorable elk habitat, and * * * to provide seclusion for wildlife".

Mr. Robert Strong, the district wildlife biologist in Gaylord, in charge of overseeing development of management plans for elk, bear and bobcat, noted that elk need large blocks of land since they normally range over 10 to 25 miles. He noted that the area in which the proposed drilling is to take place presently provides excellent habitat for elk, is within their range, and that they are commonly seen there. He stated that each well site would adversely affect elk up to two to three miles away.

Perhaps the single most revealing piece of evidence is the Environmental Impact Statement for Potential Hydrocarbon Development in the Pigeon River Country State Forest, prepared by the DNR. Some of this statement concerns the impact of production of oil and is not relevant for present purposes. However, many of the EIS's conclusions directly apply to the effects of exploratory drilling.

Testimony before the trial court indicated that six of the ten proposed sites were not adjacent to any road, requiring that roads be built to such sites. The EIS cites studies in Montana, by the Intermountain Forestry and Range Experiment Station, 1973, which concluded that "[e]lk avoid

Mr. Strong also stated his opinion that the effect on wildlife did not differ "whether there was 10 or 40" wells drilled, and concluded that a logical environment defense line for elk would rule out any further well drilling in that Forest.

Mr. Strong further testified that there has been a steady decline in bobcat population due to loss of habitat and increased development, and that the drilling of wells would have an adverse effect on bear and bobcat although he could not qualify within what radius each site would affect those animals.

Nelson Johnson, Jr., the DNR regional wildlife biologist for the northern half of the Lower Peninsula, agreed with Mr. Strong's statement that elk would be adversely affected within a two- to three-mile radius around each drilling site. Mr. Johnson stated that the sites proposed for drilling offered good habitat for elk, and had previously noted the effects of a reduction in available habitat in his testimony in *Michigan Oil Co v Natural Resources Commission, supra.* In that case he had stated:

"If they drill a well, there are not going to be a lot of elk, and bobcats and bear drop dead. But because of their aversion to this type of thing—especially the elk—and the history of how this animal has become almost extinct over almost 80 to 95 percent of its former range, indicates it is a sensitive animal. Their pattern of use of the area is going to be disrupted, and we believe and think that our research which we have carried on in our state in the past—this elk herd is going to be less able to make use of the range and therefore, since there is a limited place where they can go, sooner or later it is going to result in decrease of their population."

Dr. Donald Inman, of the Office of Environmental Review of the DNR, stated in a letter that the results of drilling in the Forest would be "that those species of wildlife for which people value the Forest and those which are susceptible to man-made disturbances will, in all probability, be reduced in number".

roads even when there is no traffic". The EIS also observed that "[w]hether the elk will return to their former range following completion of the last seismic survey work is unknown".

Seismic survey work precedes exploratory drilling and it is designed to determine whether oil might be in an area; exploratory wells are then drilled to determine if production efforts are warranted. Seismic survey work occurs over a less prolonged period than exploratory drilling and yet, apparently, may result in an extended absence of the elk to the extent that it is uncertain whether or not they will return.

Exploratory drilling obviously exacerbates this problem and, in fact, the EIS notes, "with the possibility of drilling and production development following the survey, an early return by the elk is doubtful".

The EIS observes that "[t]he most pressing need of Michigan elk is to protect their range against further human intrusion for purposes other than timber or wildlife management", and that the last remaining sanctuaries against the disturbance of oil and gas development have now disappeared. It concludes:

"Additional disturbances from hydrocarbon development, new roads, initial drilling activities, and the presence of facility sites will significantly reduce elk numbers in the proposed area. It is likely that much of the existing herd will not remain in revised Unit 1, but will spread out to the northern areas of the PRCSF and to private lands. However, private lands also may be impacted by hydrocarbon development. *An unknown number will not survive since habitat is finite.* A viable population *may* survive, however, *if* intensive management efforts are established in priority areas in the northern PRCSF *and if* poaching can be substantially

decreased throughout the elk range." (Emphasis supplied.)

The EIS also found that bobcats are "expected to retreat in the face of hydrocarbon development. The history of this species indicates a high degree of incompatibility with the works of man". With respect to bears, the EIS states "[b]ears have been pressed into wild areas of diminishing size by the increasing pressures of land development and other human disturbances throughout much of the northern Lower Peninsula. * * * It is expected that the one to two percent of the land which will be intensively developed as sites will have less impact on bears than will the development of service roads with resultant multiplied human activities and increased human contact".

Some quantification of the adverse impact of exploratory drilling on the elk can be gained from comparing the EIS's Matrix for Proposed Hydrocarbon Development in the Southern Portion of the Forest with Dr. Inman's testimony. Dr. Inman, who participated in the development of the EIS, testified that a slow recovery time is considered to be 40 to 50 years or more, a short recovery time less than 20 years, and a great recovery time is about 100 years or more.

The Environmental Impact Matrix predicts that elk will be adversely affected by the development of roads and pads. These are associated with even exploratory drilling. The Environmental Impact Matrix defines a significant adverse impact as "a change in the element that is impacted from its present status to a status that may take a *long time for recovery,* at least during the duration of the project". Applying Dr. Inman's definitions of what constitutes a slow recovery time to the ma-

trix predictions, it would appear that elk would avoid the impacted areas for 40 to 50 years.

As noted above, the trial court conceded that the exploratory drilling would have an adverse effect upon wildlife. However, the trial court determined that this adverse impact did not constitute impairment or destruction of a natural resource because such adverse impacts are

"commonly the result of management decisions. Improving deer habitat by cutting trees to allow the sun to shine on the forest floor for the purpose of new growth, it certainly has an adverse impact upon the animals, birds, so forth, using the trees. Eradicating the entire fish population in a lake or stream to destroy unwanted trash species in order to plant more acceptable fish certainly has an adverse impact on the fish killed but is an acceptable management technique. * * * These animals, along with the trees that will be cut, harvested, or otherwise removed, are the innocent victims of the discovery of oil in their forest domain".

This determination reveals a fundamental misconception. If nature is allowed to pursue its own course, the growth and expansion of some species will inevitably result in the diminution and possible extinction of others. Faced with a situation where an adverse impact will occur naturally unless some action is taken, it is a management decision to determine whether such natural processes should proceed or whether, through human intervention, the adverse impact should artificially be shifted to other species. The choice is not whether an adverse impact will occur, but, rather, upon what.

If oil or gas development does not take place, the oil and gas will not be adversely impacted. On the other hand, if such development does take place, wildlife is adversely affected. Thus, the

choice is whether or not *any* adverse impact on natural resources will be allowed.

We recognize that virtually all human activities can be found to adversely impact natural resources in some way or other. The real question before us is when does such impact rise to the level of impairment or destruction?

The DNR's environmental impact statement recognizes that "[e]lk are *unique* to this area of Michigan" and that the herd is "the *only* sizable wild herd east of the Mississippi River. Several attempts to introduce elk elsewhere in Michigan have been unsuccessful".

It is estimated that the herd's population, which numbered in excess of 1500 in 1963, now probably lies between 170 and 180. Expert testimony has established that the Pigeon River Country State Forest, particularly unit 1 in which the exploratory drilling is to take place, provides excellent habitat for elk and that the elk frequent this area. Furthermore, it is clear from the record that available habitat is shrinking. The result of a further shrinkage of this habitat by the intrusion of exploratory drilling and its concomitant developments is that "an unknown number [of elk] will not survive".

In light of the limited number of the elk, the unique nature and location of this herd, and the apparently serious and lasting, though unquantifiable, damage that will result to the herd from the drilling of the ten exploratory wells, we conclude that defendants' conduct constitutes an impairment or destruction of a natural resource.

Accordingly, we reverse and remand to the trial court for entry of a permanent injunction prohibiting the drilling of the ten exploratory wells pursuant to permits issued on August 24, 1977.

WILLIAMS, FITZGERALD, and RYAN, JJ., concurred with BLAIR MOODY, JR., J.

LEVIN, J. The issue is whether plaintiffs made a prima facie showing under the environmental protection act[1] that the drilling of ten exploratory wells in Unit 1 of the Pigeon River Country State Forest will constitute a likely impairment or destruction of natural resources.

We would vacate the judgment of the trial court and remand to it for further proceedings, retaining jurisdiction.

## I

In 1968 the Department of Natural Resources (DNR) sold oil and gas leases covering 546,196.89 acres of state-owned land including 57,669 acres in what is now known as the Pigeon River Country State Forest (PRCSF). Since that time, 19 oil and gas wells have been drilled in the PRCSF, 5 of which are producing wells.

Over a period of years, various plans to control oil and gas development in the PRCSF were considered by the DNR.[2] A management plan, allowing oil and gas development in the southern one-third of the PRCSF while prohibiting development in the northern two-thirds, was submitted by the Director of the DNR to the Natural Resources Commission (NRC). The DNR was asked to prepare an Environmental Impact Statement (EIS) with respect to the management plan, which was completed in December, 1975.

---

[1] MCL 691.1201 et seq.; MSA 14.528(201) et seq.

[2] In 1973, the DNR published a "Concept of Management" for the PRCSF. In January, 1975, a specific proposal for unitized development of the oil and gas in the PRCSF was presented to the DNR. A revised proposal was presented in October, 1975 which was published for public comment and review.

The DNR then negotiated with oil companies holding leases in the PRCSF in an effort to have them agree to the management plan. On June 11, 1976 the NRC entered into a "Stipulation Consent Order," intended to be legally binding, with Shell Oil Company, Amoco Production Company, and Northern Michigan Exploration Company. The consent order adopted the management plan allowing oil and gas development in the southern one-third of the PRCSF, subject to certain conditions and restrictions.[3]

Plaintiffs West Michigan Environmental Action Council and the Pigeon River Country Association moved to intervene in administrative proceedings concerning the consent order and sought a hearing. On August 13, 1976 the NRC rejected this motion on the basis that it was premature and could properly be granted only when permits were applied for.

On June 12, 1977 Shell Oil Company applied for permits to drill ten exploratory wells in the limited development region and on August 24, 1977 the Supervisor of Wells granted these permits.

Before the permits were applied for, on September 17, 1976, plaintiffs commenced this action under the environmental protection act claiming that the consent order was not lawfully entered into and was likely to lead to impairment of wildlife in the PRCSF. They sought an order restraining the state from issuing any permits to drill for oil or gas in the PRCSF or in any other way implementing the consent order.

---

[3] Similar consent orders were later negotiated with Sun Oil Company, Michigan Consolidated Gas Company, Getty Oil Company, and Chevron Oil Company. However, Corwith 1-22, the subject of *Michigan Oil Co v Natural Resources Commission,* 406 Mich 1; 276 NW2d 141 (1979), was not covered by a consent order.

On December 5, 1977 the court found against plaintiffs and denied a motion for a stay pending appeal.

We granted leave to appeal prior to decision by the Court of Appeals and injunctive relief pending appeal.

## II

Plaintiffs contend that the judge deferred to the DNR's conclusion that no pollution, impairment or destruction of the air, water or other natural resources or the public trust therein was likely to result from the contemplated drilling. The judge's comments in this regard are unclear, but are subject to that construction.

We agree with the plaintiffs that such deference would constitute error. A judge has a responsibility to determine independently whether pollution, impairment or destruction is likely to occur. While we can understand a judge's reluctance to substitute his judgment for an agency's informed decision, a stance generally appropriate when reviewing decisions of an administrative agency, the environmental protection act provides for a separate, independent determination by a court.

Not only does the act declare that "[p]rinciples of burden of proof and weight of the evidence generally applicable in civil actions in the circuit courts shall apply to actions brought under this act",[4] the Legislature specifically addressed the relationship between actions brought under the environmental protection act and administrative proceedings.[5] The usual standards for review of

---

[4] MCL 691.1203(1); MSA 14.528(203)(1).

[5] MCL 691.1204, 691.1205; MSA 14.528(204), 14.528(205).

administrative actions under the Administrative Procedures Act[6] are not applicable.

As recently stated in *Superior Public Rights, Inc v Department of Natural Resources,* 6 Env L Rptr 20435, 20437 (Ingham Circuit Court [1976]), where this issue was raised:

"[T]o rule that the reviewing court is bound by the administrative fact finding would be but to destroy one of the central thrusts and purposes of [MEPA]—to watchdog the controlling governing agencies themselves in order to guarantee that they do not by inadvertence become the captives of the very entities they are seeking to control and/or fail to recognize, due to ingrained myopia, inertia and bureaucratic complacence, the very environmental dangers they were established to prevent." (Digest.)

## III

Defendants have not sought to raise affirmative defenses under the environmental protection act,[7] but have rested on a denial that plaintiffs made a prima facie showing that the conduct of defendants is likely to pollute, impair or destroy the air, water or other natural resources or the public trust therein.

There is little dispute that drilling the exploratory wells will have adverse impact upon some wildlife, particularly elk, bobcat and bear. The judge found that "[t]here appears to be no question that adverse impacts will be visited upon particularly the elk, and to some lesser extent, bear and bobcat. * * * It is clear that an adverse impairment of the herd is likely for some unknown

---

[6] MCL 24.201 *et seq.;* MSA 3.560(101) *et seq.*

[7] MCL 691.1203(1); MSA 14.528(203)(1).

period to some unknown degree". He determined, however, that this adverse impact did not constitute impairment or destruction of a natural resource because such adverse impacts are

"commonly the result of management decision. Improving deer habitat by cutting trees to allow the sun to shine on the forest floor for the purpose of new growth, it certainly has an adverse impact upon the animals, birds, so forth, using the trees. Eradicating the entire fish population in a lake or stream to destroy unwanted trash species in order to plant more acceptable fish certainly has an adverse impact on the fish killed but is an acceptable management technique. * * * These animals, along with the trees that will be cut, harvested, or otherwise removed, are the innocent victims of the discovery of oil in their forest domain."

He particularly relied on the testimony of Dr. Inman, who had expressed the opinion that, although the drilling would have an adverse impact on certain species of animals, it would not have an adverse impact on the overall environment of the forest.

The examples of management technique offered by the judge are inapposite. If nature is allowed to take its own course, the growth and expansion of some species may result in the diminution and possible extinction of others. Faced with a situation where an adverse impact may occur naturally unless some action is taken, it is a management decision to determine whether such natural processes should proceed or whether, through human intervention, the adverse impact should be shifted to other species. That choice, however, is not *whether* an adverse impact on a natural resource will occur at all but what species will bear the burden of it.

The Environmental Impact Statement states

that "[e]lk are *unique* to this area of Michigan" and that the herd is "the *only* sizeable wild herd east of the Mississippi River. Several attempts to introduce elk elsewhere in Michigan have been unsuccessful". (Emphasis supplied.)

It is estimated that the herd's population, which numbered in excess of 1500 in 1963, is now probably between 170 and 180. Testimony established that the PRCSF, particularly Unit 1 in which the exploratory drilling is to take place, provides a favorable habitat for elk and that elk have frequented the area. Further, the available habitat is shrinking. It appears that the result of a further shrinkage by the intrusion of exploratory drilling is that some elk will not survive.

In light of the limited number of elk and the unique nature and location of this herd, there is evidence that defendants' conduct may impair or destroy a natural resource.

We refrain, however, from deciding whether plaintiffs made a prima facie case that defendants' conduct is likely to impair or destroy a natural resource within the meaning of the environmental protection act for reasons stated in part IV, *infra*.

## IV

The complaint alleged: "The [consent] order will or is likely to lead to pollution, impairment and/or destruction in the natural resources of the [Pigeon River Country State Forest]."

At the trial, it was unclear whether the conduct so alleged as "likely to pollute, impair or destroy the air, water or other natural resources or the public trust therein"[8] was or should be treated as limited to the effects of the consent order or

---

[8] MCL 691.1203(1); MSA 14.528(203)(1).

whether it included the effects of issuing ten permits to drill exploratory wells for oil and gas.

Eleven months after the complaint was filed, in August, 1977, the Supervisor of Wells, pursuant to the consent order, granted ten permits to drill exploratory wells. Plaintiffs then sought an injunction restraining the oil companies from exercising their rights under the permits. The circuit court denied a preliminary injunction. In September, 1977 plaintiffs appealed to the Court of Appeals which denied relief because no drilling activity could occur under the permits between then and November 30 and plaintiffs therefore would suffer no irreparable harm by denial of injunctive relief. Noting that there had not yet been a trial on the merits, the Court of Appeals ordered: "This cause be, and the same hereby is remanded for immediate trial which shall commence on or before October 10, 1977 and proceed to conclusion on an expedited schedule." The Court of Appeals, thus, apparently expected that the validity of the ten drilling permits would be contested at the trial on plaintiffs' original complaint.

Plaintiffs did not amend their complaint to specifically attack the validity of the permits. The judge indicated that he would allow such an amendment, but none was filed. As a result, there was uncertainty at the trial whether the propriety of issuing the permits themselves was properly in issue.

Plaintiffs presented evidence on and argued the likely effect of drilling ten wells. The judge, in his findings of fact, ultimately ruled that such effects were *not* in issue. He said, however, that although the effects of drilling the ten wells were "not well pled and with no attempt to amend, * * * in consideration of the court's perhaps too liberal

policy in giving the plaintiffs leeway", he had addressed the issue of the likelihood of pollution, impairment or destruction from the drilling activities contemplated by the ten permits.

The consent order stated that "[a]s many as ten test wells may be drilled for verification of seismic information. Specific drilling locations for these wells shall be determined by the oil companies and the director in consultation with the Public Service Commission".

While the question of production was left unresolved by the consent order,[9] some test wells were to be drilled. It was only their location that was to be determined by the Director of the DNR.

Plaintiffs' allegation that the consent order is likely to lead to pollution, impairment or destruction of the natural resources of the PRCSF can fairly be said to include within it the effect of issuing permits for drilling test wells, the issuance of the permits being an inevitable consequence of the adoption and implementation of the consent order.

We would, however, remand to the circuit court for further proceedings because the defendants may have been denied an opportunity to present evidence on the issue of likely impairment or destruction from the drilling of ten test wells by a belief, shared by the judge, that the effect of test drilling was not in issue.

We would vacate the judgment of the trial court and remand to it for further proceedings, and retain jurisdiction.

COLEMAN, C.J., and KAVANAGH, J., concurred with LEVIN, J.

---

[9] The consent agreement states with respect to production of oil and gas: "It is further agreed by the parties that before production of oil and gas takes place in the limited development region, the oil companies *shall submit to the Director for his approval a development plan and an environmental assessment.*" (Emphasis supplied.)