FRIENDS OF CRYSTAL RIVER v KURAS PROPERTIES

Docket No. 177038. Submitted July 11, 1996, at Grand Rapids. Decided August 23, 1996, at 9:45 A.M. Leave to appeal sought.

Michigan United Conservation Clubs brought an action in the Ingham Circuit Court against Kuras Properties and others, seeking to block the issuance by the Department of Natural Resources of a permit under the Wetland Protection Act (WPA), MCL 281.701 *et seq.*; MSA 18.595(51) *et seq.*, now MCL 324.30301 *et seq.*; MSA 13A.30301 *et seq.*, to allow the filling of wetlands in connection with the construction of an eighteen-hole golf course on land adjoining a resort owned by the defendant developers and abutting the Crystal River. The DNR, which originally denied the permit application, agreed to issue a permit after the defendant developers agreed to environmental safeguards required by the DNR for the construction and operation of the golf course. The court, Thomas L. Brown, J., remanded the matter to the DNR for further proceedings before a hearing referee. The referee allowed Friends of Crystal River (FOCR) to intervene in opposition to the permit application. Following hearings, the referee recommended that a permit be issued. The Natural Resources Commission followed the referee's recommendation. The court affirmed the decisions of the commission and the referee. FOCR appealed.

The Court of Appeals *held*:

The issuance of the disputed permit and the proposed construction and operation of the golf course are not prevented by the WPA or the Michigan Environmental Protection Act, MCL 691.1201 *et seq.*; MSA 14.528(201) *et seq.*, now MCL 324.1701 *et seq.*; MSA 13A.1701 *et seq.*

1. A balancing of the benefits that reasonably may be expected to accrue from the construction and operation of the golf course against the reasonably foreseeable detriments of the activity, MCL 281.709(2); MSA 18.595(59)(2), now MCL 324.30311(2), MSA 13A.30311(2), indicates that the golf course is in the public interest, MCL 281.709(1); MSA 18.595(59)(1); now MCL 324.30311(1); MSA 13A.30311(1). The defendants showed that feasible and prudent alternative locations and methods to accomplish the expected benefits from the proposed activity were unavailable, MCL

281.709(2)(b); MSA 18.595(59)(2)(b), now MCL 324.30311(2)(b); MSA 13A.30311(2)(b).

2. The defendants established that an unacceptable disruption of aquatic resources will not result from the proposed activity, MCL 281.709(4); MSA 18.595(59)(4), now MCL 324.30311(4); MSA 13A.30311(4).

3. The contention by focr that the proposed activity is not otherwise lawful, as required under MCL 281.709(1); MSA 18.595(59)(1), now MCL 324.30311(1); MSA 13A.30311(1), is without merit. The fact that a permit under the Water Resources Commission act, MCL 323.1 *et seq.*; MSA 3.521 *et seq.*, and a permit from the United States Corps of Engineers remain to be secured does not affect the lawfulness of the proposed activity under the wpa, which does not require that other permits be first obtained before a permit under the wpa can be sought. The claim by focr that the quality of the Crystal River would be degraded, thus leading to a violation of 1986 AACS, R 323.1098(9), is not supported by the evidence.

4. Focr failed to establish a prima facie case that the proposed activity would lead to an impairment or destruction of a natural resource, MCL 691.1205; MSA 14.528(205), now MCL 324.1705; MSA 13A.1705.

5. The trial court harmlessly erred in stating that it would use the "substantial evidence" test to review the hearing referee's findings regarding the wpa. A review of the trial court's analysis indicates that the court engaged in the requisite review de novo.

6. The hearing referee did not err in failing to grant focr subpoena power, and the trial court did not abuse its discretion in denying a discovery motion by focr. Focr failed to cite statutory authority for the grant of subpoena power, and the dnr file on the defendant developers' applications for a permit, including the documents they submitted therewith, were available to focr.

7. The trial court did not abuse its discretion in not allowing focr to present new evidence regarding the construction of a nine-hole golf course or in denying a motion for reconsideration on the basis of the same new evidence. Evidence that the defendant developers chose a smaller course is irrelevant to the issues decided in this case.

8. Focr raised a meritless argument in contending that the proposed golf course would violate the public trust doctrine because golfers would be hitting over the Crystal River. Focr failed to cite authority in support of its claim that such use of airspace affects valuable fish and game habitat or impinges on the public's right to fish and boat in the affected area.

Affirmed.

1. ENVIRONMENT — WETLAND PROTECTION ACT — PERMITS.

>A permit for an activity that is otherwise prohibited by the Wetland Protection Act should not be issued unless it is determined that the issuance of a permit is in the public interest, that the permit is necessary to realize the benefits from the activity, and that the activity is otherwise lawful; a permit should not be issued unless it is shown that an unacceptable disruption of aquatic resources will not result (MCL 281.709; MSA 18.595[59], now MCL 324.30311; MSA 13A.30311).

2. ENVIRONMENT — WETLAND PROTECTION ACT — PERMITS — UNAVAILABILITY OF FEASIBLE AND PRUDENT ALTERNATIVES.

>In determining whether it is in the public interest to issue a permit to allow an activity that is otherwise prohibited by the Wetland Protection Act, the availability of feasible and prudent alternative locations and methods to accomplish the expected benefits from the activity must be considered; in this regard, "prudent" means exercising sound judgment and "feasible" means capable of being put into effect or accomplished, practicable, capable of being successfully utilized, or suitable (MCL 281.709[2][b]; MSA 18.595[59][2][b], now MCL 324.30311[2][b]; MSA 13A.30311[2][b]).

3. ENVIRONMENT — WETLAND PROTECTION ACT — PERMITS — OTHERWISE LAWFUL ACTIVITY.

>In determining whether an activity that is prohibited by the Wetland Protection Act is otherwise lawful and should be allowed under a permit issued pursuant to the act, consideration need not be given to whether permits required by other authorities have been obtained (MCL 281.709[1]; MSA 18.595[59][1], now MCL 324.30311[1]; MSA 13A.30311[1]).

4. ENVIRONMENT — ENVIRONMENTAL PROTECTION ACT — IMPAIRMENT OR DESTRUCTION OF NATURAL RESOURCES — FEASIBLE AND PRUDENT ALTERNATIVES.

>Conduct alleged to constitute impairment or destruction of natural resources should not be allowed by a court where there is a feasible and prudent alternative that is consistent with the reasonable requirements of the public health, safety, and welfare (MCL 691.1205[2]; MSA 14.528[205][2], now MCL 324.1705[2]; MSA 13A.1705[2]).

5. NAVIGABLE WATERS — PUBLIC TRUST.

>A public trust protects navigable waters so as to preserve the valuable fish and game habitat and assure the public's right to fish and boat.

*Olson & Noonan, P.C.* (by *James M. Olson* and *John D. Noonan*), for Friends of Crystal River.

*Varnum, Riddering, Schmidt & Howlett* (by *Nyal D. Deems* and *Matthew D. Zimmerman*) for Kuras Properties, Robert A. Kuras, and Continental Equities, Inc.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Stephen M. Rideout*, Assistant Attorney General, for Department of Natural Resources and Director of Department of Natural Resources.

Before: DOCTOROFF, C.J., and WAHLS and SMOLENSKI, JJ.

DOCTOROFF, C.J. This case involves a golf course proposed by Robert A. Kuras, the owner of the Homestead Resort in Glen Arbor Township. Kuras seeks to develop an eighteen-hole golf course on property contiguous to the resort. The area proposed for the development includes wetlands and portions of land along the Crystal River. Plaintiff, Friends of Crystal River (FOCR), opposes the issuance of a proposed construction permit by defendant Department of Natural Resources (DNR). Plaintiff argues that the proposed construction would violate the Wetland Protection Act (WPA), MCL 281.701 *et seq.*; MSA 18.595(51) *et seq.*, and the Michigan Environmental Protection Act (MEPA), MCL 691.1201 *et seq.*; MSA 14.528(201) *et seq.*

The Homestead is a resort covering approximately 492 acres, including over a mile of frontage on Lake Michigan and approximately 3.6 miles of shoreline of the Crystal River. The resort contains over four hundred condominium units, over fifty single-family

homesites, and seventy-seven hotel rooms. In addition, there are restaurants, clay tennis courts, platform tennis courts, swimming pools, and numerous specialty shops on the property. However, Kuras argues that, because of the increasing popularity of golf as a vacation attraction, the Homestead has lost business to its competitors, each of which possesses at least one eighteen-hole golf course on its resort premises. Kuras determined that, in order to remain competitive with the other upscale resorts in northern Michigan, the Homestead would have to construct an eighteen-hole, championship golf course that would be contiguous to the resort. Kuras also sought to construct the golf course to attract more visitors in the spring and fall, when the weather is less conducive to beach and water activities. In the past, the Homestead had attempted to associate with preexisting golf courses located in the area, but the distances to the courses and the Homestead's lack of control over course availability proved too problematic.

Six different locations were considered for the new golf course. However, the options were limited by unavailability of land, lack of access, or distance from the resort. In order to make the Homestead competitive in the marketplace, Kuras sought a course location that was contiguous to the resort property. According to Kuras, the site that was eventually chosen was the only feasible, contiguous location available. Kuras hired golf course architect Robert Walker to design the course. Although both Kuras and Walker sought to minimize environmental disturbance, the proposed golf course required that 3.68 acres of wetlands be filled.

On January 5, 1988, Kuras filed a permit application with the DNR, pursuant to the WPA,[1] seeking permission to fill portions of wetland area during construction of the golf course. This original application was denied because of Kuras' failure to demonstrate that no feasible and prudent alternatives to filling the wetlands existed and to show that an unacceptable disruption of aquatic resources would not occur. Kuras then submitted additional studies to the DNR regarding the potential effect on aquatic resources and the lack of an alternate site. The DNR agreed with Kuras that there were no feasible and prudent alternatives to building the course on the proposed site, but the DNR found that an unacceptable disruption of aquatic resources would occur unless certain conditions were met during the construction and operation of the golf course. After negotiations, Kuras and the DNR signed a draft permit and a proposed consent judgment applicable to several cases in the Leelanau Circuit Court in which Kuras sought judicial review of DNR actions. Under the consent judgment, Kuras agreed to comply with certain environmental safeguards during the construction and operation of the facility. However, because there had been no administrative hearing, the Leelanau Circuit Court refused to enter the consent judgment and eventually dismissed the actions.

Thereafter, the Michigan United Conservation Clubs (MUCC) filed an action in the Ingham Circuit Court, seeking to block the issuance of a permit to

---

[1] The provisions of the WPA were repealed by 1995 PA 59, effective May 24, 1995, and were replaced with substantially similar provisions in the Natural Resources and Environmental Protection Act. See MCL 324.30301 *et seq.*; MSA 13A.30301 *et seq.* The repealed language of the WPA that is relevant to this case, MCL 281.709; MSA 18.595[59], is identical to the current language of MCL 324.30311; MSA 13A.30311.

Kuras. The trial court remitted the case to the DNR for development of the record with regard to all issues. On June 7, 1989, plaintiff FOCR was granted intervenor status by DNR Hearing Referee William C. Fulkerson. Following extensive administrative hearings, the hearing referee issued an exhaustive, eighty-eight-page proposal for decision on August 27, 1990, recommending that the DNR issue the proposed permit to Kuras. On November 14, 1990, the Natural Resources Commission (NRC) affirmed the proposal of the hearing referee and adopted it as its findings of fact and conclusions of law. On March 11, 1992, the MUCC was dismissed as a party. The case then returned to the trial court, which issued an opinion on April 14, 1994, affirming the findings of the NRC and the hearing referee. Plaintiff now appeals, claiming that the proposed development would violate the WPA and the MEPA. We affirm.

Plaintiff first contends that the trial court erred in affirming the hearing referee's findings with respect to the WPA. Under the WPA, the court was required to determine whether a proposal that would affect wetlands "is in the public interest" and whether the "permit is necessary to realize the benefits derived from the activity." MCL 281.709(1); MSA 18.595(59)(1).[2] In determining whether a proposed activity is in the public interest, the benefit that reasonably may be expected to accrue from the proposal is to be balanced against the reasonably foreseeable detriments of the activity. MCL 281.709(2); MSA 18.595(59)(2).[3]

---

[2] This language is currently found in MCL 324.30311(1); MSA 13A.30311(1).

[3] This language is currently found in MCL 324.30311(2); MSA 13A.30311(2).

Undisputed testimony showed that the project would benefit the public by stabilizing year-round employment levels and increasing tourism. However, another factor to be considered when determining the public interest is the "availability of *feasible and prudent alternative* locations and methods to accomplish the expected benefits from the activity." MCL 281.709(2)(b); MSA 18.595(59)(2)(b) (emphasis added). Similarly, MCL 281.709(4); MSA 18.595(59)(4)[4] states that if a proposal involves wetland disruption, a permit will not be issued unless the applicant shows either that the proposed activity is primarily dependent on being located in the wetland or that a *feasible and prudent alternative* does not exist. In the context of the WPA, the term "feasible and prudent alternative" has not been defined by the statute or the courts.[5]

This Court has had the opportunity to interpret the phrase "feasible and prudent alternative" as used in the MEPA, MCL 691.1203(1); MSA 14.528(203)(1). *Wayne Co Dep't of Health v Olsonite Corp,* 79 Mich App 668, 700-706; 263 NW2d 778 (1977). In that case, this Court adopted language from federal courts that had defined "feasible" and "prudent" in other contexts and applied the same definitions to the terms in § 3(1) of the MEPA. However, we find that the definitions set forth in *Olsonite* are inapplicable to the simi-

---

[4] This language is currently found in MCL 324.30311(4); MSA 13A.30311(4).

[5] In *Harkins v Dep't of Natural Resources,* 206 Mich App 317; 520 NW2d 653 (1994), a panel of this Court applied the term "feasible and prudent alternatives" in the context of the WPA, but did not define the language.

lar phrase in the WPA.[6] In *Olsonite*, this Court interpreted language of the MEPA that shifted the burden of proof to the defendant when asserting an affirmative defense to a charge of pollution. *Id.* at 701. The portions of the WPA containing the "feasible and prudent" language merely involve questions of alternative options to wetland disruption, and do not implicate issues of affirmative defenses or burden shifting. MCL 281.709(2)(b); MSA 18.595(59)(2)(b), MCL 281.709(4); MSA 18.595(59)(4). Because of the differing context of the phrase as it is used in § 3(1) of the MEPA, the *Olsonite* interpretation of "reasonable and prudent" is inapplicable to our inquiry under the WPA.

In addition, in interpreting the language of § 3(1) of the MEPA, the *Olsonite* panel expressly rejected the notion that the phrase "prudent alternative" requires a comprehensive balancing of competing interests. *Olsonite, supra* at 705. Conversely, the WPA expressly requires that "the benefit which reasonably may be expected to accrue from the proposal *shall be balanced* against the reasonably foreseeable detriments of the activity." MCL 281.709(2); MSA 18.595(59)(2) (emphasis added). It is clear that the "feasible and prudent" language of § 3(1) of the MEPA, which was interpreted in *Olsonite*, bears little resemblance to the same language in the WPA, which we are now called to construe. Thus, *Olsonite* offers little guidance for interpretation of the instant statute.

---

[6] The "feasible and prudent" language of the MEPA that was interpreted in *Olsonite* is found in MCL 691.1203(1); MSA 14.528(203)(1). We make no determination regarding *Olsonite's* effect on the construction of the same phrase in a different section of the MEPA, MCL 691.1205(2); MSA 14.528(205)(2).

Thus, we are left with the task of giving meaning to the phrase "feasible and prudent alternative" as used in the WPA. Our duty is to identify and effectuate the intent of the Legislature and, if necessary, interpret language that does not on its face reveal legislative intent. *Piper v Pettibone Corp*, 450 Mich 565, 571; 542 NW2d 269 (1995). A fundamental rule of statutory construction is that the Legislature is presumed to have intended the plain meaning of words used in a statute. *Attorney General v Sanilac Co Drain Comm'r*, 173 Mich App 526, 531; 434 NW2d 181 (1988). Because the words "feasible" and "prudent" are not defined by the statute, an acceptable method of determining intent is to refer to a dictionary for the common usage of the words. *Nelson v Grays*, 209 Mich App 661, 664; 531 NW2d 826 (1995). A "feasible" alternative is one that is "capable of being put into effect or accomplished; practicable" or "capable of being successfully utilized; suitable." *Funk & Wagnalls Standard Dictionary* (1980). "Prudent" is defined as "exercising sound judgment." *Id.*

In *Ray v Mason Co Drain Comm'r*, 393 Mich 294; 224 NW2d 883 (1975), the Court noted the Legislature's imprecise language in the area of environmental regulation:

> The Legislature in establishing environmental rights set the parameters for the standard of environmental quality but did not attempt to set forth an elaborate scheme of detailed provisions designed to cover every conceivable type of environmental pollution or impairment. Rather, the Legislature spoke as precisely as the subject matter permits and in its wisdom left to the courts the important task of giving substance to the standard by developing a common law of environmental quality. [*Id.* at 306.]

Given the flexibility offered the courts by *Ray*, and using the dictionary definitions above, we find that defendant met his burden of showing that there existed no "feasible and prudent" alternative to the proposed golf course. Kuras' goal in proposing the golf course was to reduce the seasonality of the resort and to increase its competitiveness in the marketplace, where each other destination resort possessed at least one contiguous eighteen-hole golf course. The evidence showed that much of the property near the Homestead was owned by the National Park Service or the Department of the Interior, was underwater, or was otherwise unavailable. Kuras demonstrated that, in order to be competitive with other northern Michigan destination resorts, the Homestead golf course needed to be contiguous to the resort as opposed to several miles away. The evidence at the administrative hearing established that the proposed site was the only location that could accomplish Kuras' goals of being competitive in the marketplace and reducing the seasonality of the resort. Accordingly, we find that Kuras satisfied his burden of showing the lack of "availability of feasible and prudent alternative locations." MCL 281.709(2)(b); MSA 18.595(59)(2)(b). In accomplishing Kuras' legitimate objectives, no other location was "practicable," "suitable," or "capable of being successfully utilized," nor would building the course in another location constitute the "exercis[e] [of] sound judgment." *Funk & Wagnalls Standard Dictionary* (1980).

Having found that construction of the golf course was in the public interest, and no feasible and prudent alternatives existed, the next question is whether

Kuras showed that "an unacceptable disruption will not result to the aquatic resources." MCL 281.709(4); MSA 18.595(59)(4). We find that Kuras satisfied his burden. Charles Wolverton of the DNR spent an "unprecedented" sixteen days reviewing the site of the proposed golf course. Wolverton suggested over ninety revisions to Kuras' plan, which revisions were designed to minimize the effect on wetlands. Each suggested change was incorporated into the course design. Although the golf course construction would necessitate the destruction of 3.68 acres of wetlands, 6.63 acres of new wetlands were to be created in mitigation. Expert testimony indicated that such mitigation would more than compensate for the lost wetlands. In addition, on the subject property, approximately eighty-four acres of wetlands would remain in their natural state.

The evidence further indicated that construction and maintenance of the golf course would not negatively affect the wetlands or the nearby Crystal River. The course was intentionally designed to prevent pesticide and fertilizer runoff into the river and surrounding waters, and a buffer zone was included between the course and the river. In proposing to issue a permit to Kuras, the DNR imposed conditions that were aimed at preventing disruption of aquatic resources. The scope of these conditions went beyond restrictions on the course construction to include regulation of the golf course operations. After extensive studies of the proposed chemicals, soil, grass type, and course design, DNR experts, as well as those hired by Kuras, agreed that the effect of any potential migration of nutrients or pesticides would be negligible. Thus, Kuras met his statutory burden of showing that

no unacceptable disruption of the aquatic resources would occur during the construction and maintenance of the proposed golf course. MCL 281.709(4); MSA 18.595(59)(4).

Plaintiff next argues that Kuras should not be granted a permit under the WPA because the statute requires that the proposal be "otherwise lawful." MCL 281.709(1); MSA 18.595(59)(1).[7] Plaintiff contends that Kuras has not yet received a permit under the Water Resources Commission act (WRCA), MCL 323.1 *et seq.;* MSA 3.521 *et seq.*, or a federal permit from the United States Corps of Engineers, and thus has not shown that the project is "otherwise lawful." However, the WPA does not require that all other permits be first obtained before a party may seek a permit under the statute, and plaintiff cites no authority for its position. Thus, plaintiff's argument is waived. *In re Powers,* 208 Mich App 582, 588; 528 NW2d 799 (1995). Plaintiff contends that the quality of the Crystal River would be degraded by the proposed project, thus violating the WRCA, 1986 AACS, R 323.1098(9), and causing the project not to be "otherwise lawful." However, the evidence from the administrative hearing demonstrated that the proposed project would have little, if any, negative ecological effect. There has been no showing that the proposal would likely be found "otherwise" unlawful or that the WPA requires that all other permits be obtained before the WPA permit is considered. Plaintiff's arguments in this regard are without merit.

---

[7] This language is currently found in MCL 324.30311(1); MSA 13A.30311(1).

Because no feasible and prudent alternative existed to building the golf course on the proposed site, there would be no unacceptable disruption of aquatic resources, and there was no evidence that the proposal was not "otherwise lawful," we find that, with respect to the WPA, MCL 281.709; MSA 18.595(59), the circuit court did not err in finding that a permit could properly be granted to Kuras.

Plaintiff next argues that Kuras should have been denied the permit on the basis of the MEPA, MCL 691.1205; MSA 14.528(205).[8] Under the statute, the trial court was obliged to determine whether the proposed conduct represented an "impairment or destruction" of any natural resources. If such impairment were found, the court could not authorize the project "so long as there is a feasible and prudent alternative consistent with the reasonable requirements of public health, safety and welfare." MCL 691.1205(2); MSA 14.528(205)(2). The opinion rendered by the trial court shows a thorough review de novo of the entire record and reflects a finding that plaintiff failed to make a prima facie showing that the proposed action would impair or destroy a natural resource. The court therefore never reached the question whether a prudent and feasible alternative existed under § 5(2) of the MEPA. We affirm the trial court's finding that plaintiff failed to show that the proposed project would cause an impairment or destruction of natural resources.

As set forth above, defendants' plan was to replace the destroyed wetlands with almost twice as many

---

[8] These provisions of the MEPA were repealed by 1994 PA 451 and were replaced with substantially similar language in MCL 324.1705; MSA 13A.1705.

acres of mitigation wetlands. The benefits that flow from a wetland, and that have been recognized by the Legislature, are inherent in the wetland whether it "was fashioned by the hand of nature or of man." *Citizens Disposal, Inc v Dep't of Natural Resources*, 172 Mich App 541, 551-553; 432 NW2d 315 (1988). In addition, scientific evidence and testimony presented before the hearing referee indicated that the construction and operation of the proposed golf course would not cause damage to the Crystal River or the neighboring wetlands. The DNR secured Kuras' continuing adherence to the environmental protection plan by making the proposed permit conditional on the following of certain construction and operational safeguards. Accordingly, we affirm the trial court's finding that no impairment or destruction of natural resources was likely. Thus, we find that the MEPA does not prevent Kuras from obtaining the permit to build the proposed golf course.

Plaintiff next contends that the trial court erred in using the "substantial evidence" test to review the hearing referee's findings regarding the WPA, as opposed to conducting a review de novo. When a court remits a matter to an administrative agency, the court retains jurisdiction and reviews the case de novo. *West Michigan Environmental Action Council v Natural Resources Comm*, 405 Mich 741, 752-753; 275 NW2d 538 (1979). Thus, the circuit court erred in stating it would use the "substantial evidence" test in reviewing the WPA findings of the hearing referee, which were adopted by the NRC. However, the error was harmless.

The trial court fully explored the issues regarding the WPA, and the analysis withstands review de novo.

Furthermore, in analyzing the MEPA claim, the trial court conducted a thorough review de novo of the entire record. The trial court reviewed the testimony of witnesses who established that construction of the golf course was in the public interest and that there were no feasible and prudent alternative sites for the proposed project. The trial court further set forth a detailed summary of defendants' mitigation plan and the agreement relating to environmental accommodations during the construction and operation of the golf course. Even under a review de novo, the trial court's analysis was sufficient to show that, under the WPA, there existed no feasible and prudent alternatives to the proposed project and that the proposal would cause no unacceptable disruption of aquatic resources. Thus, although the trial court erred in stating that it was using the "substantial evidence" test to review the hearing referee's findings regarding the WPA, the error was harmless.

Plaintiff next argues that the hearing referee should have given it subpoena power and that the trial court erred in failing to allow plaintiff to conduct discovery or present new evidence. We disagree. An agency or a hearing referee must be authorized by statute to issue subpoenas. MCL 24.273; MSA 3.560(173). Plaintiff points to no statute allowing the DNR to do so in a hearing involving the WPA. Similarly, the trial court did not err in denying plaintiff's motion for discovery. A trial court's decision to grant or deny discovery is reviewed for an abuse of discretion. *SCD Chemical Distributors, Inc v Medley*, 203 Mich App 374, 382; 512 NW2d 86 (1994). Defendant Kuras had twice applied for a permit with the DNR and he provided the agency with all requested documents. The DNR com-

piled an extensive file, which was available to plaintiff. In addition, plaintiff had the opportunity to cross-examine each witness at the administrative hearing and could have called any further witnesses to testify at that time. Accordingly, we find that the record compiled at the hearing before the DNR was fully developed, and, thus, the trial court did not abuse its discretion in denying plaintiff's motion for discovery.

Plaintiff also claims that the trial court abused its discretion in failing to allow plaintiff to present new evidence regarding the Homestead's construction of a nine-hole golf course. On the same basis, plaintiff filed a motion for reconsideration of the trial court's decision. However, undisputed evidence established that, to accomplish the goals of reducing seasonality and increasing its competitiveness, the Homestead required an eighteen-hole golf course contiguous to the resort. Accordingly, evidence of a nine-hole course was irrelevant to the question whether there was a feasible and prudent alternative to the proposed project. MRE 401. A showing that the Homestead opted for a diminished project during these proceedings would have no effect on the issues to be decided in this action. Thus, the trial court properly denied plaintiffs' motions for admission of new evidence and reconsideration.

Finally, plaintiff argues that the proposed golf course violates the doctrine of public trust because golfers would be hitting over the river, thus violating the airspace above the public waterway. We disagree. A public trust protects navigable waters so as to preserve the valuable fish and game habitat and assure the public's right to fish and boat in the subject area. *People v Babcock*, 38 Mich App 336, 350-351; 196

NW2d 489 (1972). Plaintiff cites no authority supporting the argument that any use of the airspace over the navigable waterway impinges on the public trust doctrine. The issue is effectively abandoned. *Powers, supra* at 588.

On the basis of the above analysis, we affirm the findings of fact and conclusions of law by the Ingham Circuit Court. We find that neither the WPA nor the MEPA prevents the Homestead from constructing the proposed golf course. However, we make no determination regarding any other permits Kuras may need to obtain before constructing the proposed golf course.

Affirmed.