*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* APPLICATION OF ENBRIDGE ENERGY
TO REPLACE AND RELOCATE LINE 5.

---

LITTLE TRAVERSE BAY BANDS OF ODAWA
INDIANS,

        Appellant,

v

MPSC, MACKINAC STRAITS CORRIDOR
AUTHORITY, MICHIGAN PROPANE GAS
ASSOCIATION, NATIONAL PROPANE GAS
ASSOCIATION, and MICHIGAN LABORERS'
DISTRICT COUNCIL,

        Appellees,

and

ENBRIDGE ENERGY LIMITED PARTNERSHIP,

        Petitioner-Appellee.

FOR PUBLICATION
February 19, 2025
1:46 PM

No. 369156
Public Service Commission
LC No. 00-020763

---

*In re* APPLICATION OF ENBRIDGE ENERGY
TO REPLACE AND RELOCATE LINE 5.

---

MICHIGAN ENVIRONMENTAL COUNCIL, TIP
OF THE MITT WATERSHED COUNCIL, and
NATIONAL WILDLIFE FEDERATION,

        Appellants,

v

MPSC, MACKINAC STRAITS CORRIDOR
AUTHORITY, MICHIGAN PROPANE GAS
ASSOCIATION, NATIONAL PROPANE GAS
ASSOCIATION, and MICHIGAN LABORERS'
DISTRICT COUNCIL,

   Appellees,

and

ENBRIDGE ENERGY LIMITED PARTNERSHIP,

   Petitioner-Appellee.

No. 369157
Public Service Commission
LC No. 00-020763

---

*In re* APPLICATION OF ENBRIDGE ENERGY
TO REPLACE AND RELOCATE LINE 5.

---

BAY MILLS INDIAN COMMUNITY,

   Appellant,

v

MPSC, MACKINAC STRAITS CORRIDOR
AUTHORITY, MICHIGAN PROPANE GAS
ASSOCIATION, NATIONAL PROPANE GAS
ASSOCIATION, and MICHIGAN LABORERS'
DISTRICT COUNCIL,

   Appellees,

and

ENBRIDGE ENERGY LIMITED PARTNERSHIP,

   Petitioner-Appellee.

No. 369159
Public Service Commission
LC No. 00-020763

---

*In re* APPLICATION OF ENBRIDGE ENERGY
TO REPLACE AND RELOCATE LINE 5.

---

GRAND TRAVERSE BAND OF OTTAWA AND
CHIPPEWA INDIANS,

        Appellant,

v

MPSC, MACKINAC STRAITS CORRIDOR
AUTHORITY, MICHIGAN PROPANE GAS
ASSOCIATION, NATIONAL PROPANE GAS
ASSOCIATION, and MICHIGAN LABORERS'
DISTRICT COUNCIL,

        Appellees,

and

ENBRIDGE ENERGY LIMITED PARTNERSHIP,

        Petitioner-Appellee.

No. 369161
Public Service Commission
LC No. 00-020763

---

*In re* APPLICATION OF ENBRIDGE ENERGY
TO REPLACE AND RELOCATE LINE 5.

---

NOTTAWASEPPI HURON BAND OF THE
POTAWATOMI,

        Appellant,

v

MPSC, MACKINAC STRAITS CORRIDOR
AUTHORITY, MICHIGAN PROPANE GAS
ASSOCIATION, NATIONAL PROPANE GAS
ASSOCIATION, and MICHIGAN LABORERS'
DISTRICT COUNCIL,

        Appellees,

and

ENBRIDGE ENERGY LIMITED PARTNERSHIP,

        Petitioner-Appellee.

No. 369162
Public Service Commission
LC No. 00-020763

*In re* APPLICATION OF ENBRIDGE ENERGY
TO REPLACE AND RELOCATE LINE 5.

FOR LOVE OF WATER,

      Appellant,

v

MPSC, MACKINAC STRAITS CORRIDOR
AUTHORITY, MICHIGAN PROPANE GAS
ASSOCIATION, NATIONAL PROPANE GAS
ASSOCIATION, and MICHIGAN LABORERS'
DISTRICT COUNCIL,

      Appellees,

and

ENBRIDGE ENERGY LIMITED PARTNERSHIP,

      Petitioner-Appellee.

No. 369163
Public Service Commission
LC No. 00-020763

*In re* APPLICATION OF ENBRIDGE ENERGY
TO REPLACE AND RELOCATE LINE 5.

ENVIRONMENTAL LAW & POLICY CENTER
and MICHIGAN CLIMATE ACTION NETWORK,

      Appellants,

v

MPSC, MACKINAC STRAITS CORRIDOR
AUTHORITY, MICHIGAN PROPANE GAS
ASSOCIATION, NATIONAL PROPANE GAS
ASSOCIATION, and MICHIGAN LABORERS'
DISTRICT COUNCIL,

      Appellees,

No. 369165
Public Service Commission
LC No. 00-020763

and

ENBRIDGE ENERGY LIMITED PARTNERSHIP,

        Petitioner-Appellee.

---

*In re* APPLICATION OF ENBRIDGE ENERGY
TO REPLACE AND RELOCATE LINE 5.

---

MATTHEW S. BORKE,

        Appellant,

v

MPSC, MACKINAC STRAITS CORRIDOR
AUTHORITY, MICHIGAN PROPANE GAS
ASSOCIATION, NATIONAL PROPANE GAS
ASSOCIATION, and MICHIGAN LABORERS'
DISTRICT COUNCIL,

        Appellees,

and

ENBRIDGE ENERGY LIMITED PARTNERSHIP,

        Petitioner-Appellee.

No. 369231
Public Service Commission
LC No. 00-020763

---

Before: M. J. KELLY, P.J., and LETICA and WALLACE, JJ.

PER CURIAM.

These consolidated appeals stem from a December 1, 2023 order of the Michigan Public Service Commission ("PSC" or "Commission") in which the PSC conditionally approved the application of Enbridge Energy Limited Partnership to relocate a portion of its "Line 5" fuel pipeline into a tunnel beneath the Straits of Mackinac. In Docket Nos. 369156, 369159, 369161, and 369162, intervenors Little Traverse Bay Bands of Odawa Indians, Bay Mills Indian Community, Grand Traverse Band of Ottawa and Chippewa Indians, and Nottawaseppi Huron Band of the Potawatomi ("the Tribes") appeal the order as of right. In Docket No. 369157, intervenors Michigan Environmental Council, Tip of the Mitt Watershed Council, and National Wildlife Federation appeal the order as of right; in Docket No. 369163, intervenor For Love of

Water appeals the order as of right; and in Docket No. 369165, intervenors Environmental Law & Policy Center and Michigan Climate Action Network appeal the order as of right.[1] We affirm.

Enbridge, as well as the PSC and intervenors Mackinac Straits Corridor Authority ("MSCA"), Michigan Propane Gas Association, National Propane Gas Association, and Michigan Laborers' District Council argue in support of upholding the December 1, 2023 order. Amici curiae Michigan Chamber of Commerce and Small Business Association of Michigan filed briefs in support of upholding the order. Amici curiae Great Lakes Business Network and Michigan Attorney General ("AG")[2] filed briefs in support of a reversal or remand.

The intervenor-appellants contend that the PSC, when considering Enbridge's application, erred by only looking to the public need for the new portion of pipeline, to be located in a tunnel underneath the lakebed ("the Replacement Project"), as opposed to reconsidering the need for Line 5 as a whole. They also contend that the PSC used improper comparisons for its analysis under the Michigan Environmental Protection Act ("MEPA"), MCL 324.1701, *et seq.*, and inadequately analyzed the impact of greenhouse-gas emissions ("GHGs") as they relate to supply of and demand for petroleum products. For the reasons set forth in this opinion, we find no basis to reverse or remand.

## I. GENERAL FACTS

## A. BACKGROUND INFORMATION, INCLUDING APPLICABLE LAWS AND AGREEMENTS

1929 PA 16 ("Act 16"), codified at MCL 483.1 *et seq.*, vests the PSC with the power to regulate the transportation of "crude oil or petroleum, or any of the products thereof, or carbon dioxide substances, by or through pipe line or lines. . . ." See MCL 483.3. Mich Admin Code, R 792.10447(1)(c) states, in applicable part, that a "corporation, association, or person conducting oil pipeline operations within the meaning of 1929 PA 16, MCL 483.1 to 483.11, that wants to construct facilities to transport crude oil or petroleum or any crude oil or petroleum products as a common carrier" must file an application with the PSC for the authority to do so.

The present case began on April 17, 2020, when Enbridge filed an application asking the PSC to authorize Enbridge to proceed with a "Straits Line 5 Replacement Segment." See *In re Enbridge Energy, Ltd Partnership*, order of the Public Service Commission, entered December 1, 2023 (Case No. U-20763), p 1. "[T]he project involves replacing the segment of the Line 5 pipeline (Line 5) that crosses the Straits of Mackinac (Straits) in Michigan with a single, 30-inch

---

[1] In Docket No. 369231, Matthew S. Borke attempts to file an appeal as of right from the order. As will be discussed *infra*, he has no basis for doing so.

[2] We note, however, that the AG's office supports upholding the order in its capacity as counsel for the PSC and the MSCA.

diameter pipe and relocating the segment to a 'concrete-lined tunnel below the lakebed of the Straits' (Replacement Project)." *Id.* at 1-2.

The PSC's order engendering these appeals includes the following useful summary of some of the pertinent underlying facts:

> In its application, Enbridge explained that Line 5 was constructed by Lakehead Pipe Line Company (Lakehead) in 1953 and that it is a 645-mile inter-state pipeline that traverses Michigan's Upper and Lower Peninsulas, originating in Superior, Wisconsin, and terminating near Sarnia, Ontario, Canada. Enbridge stated that Line 5 was built to transport light crude oils and natural gas liquids (NGLs). While the vast majority of product shipped through Line 5 travels through Michigan to Canada, Enbridge asserted that Line 5 delivers NGLs to a propane production facility in Rapid River, Michigan, and delivers light crude oil to facilities that interconnect with other pipelines in Lewiston and Marysville, Michigan. Line 5 has an annual average capacity of 540,000 barrels per day (bpd), and Enbridge stated that the Replacement Project will not impact its annual average capacity or the nature of the service provided by Line 5.

> Enbridge explained that where Line 5 crosses the Straits, it currently consists of two, 20-inch-diameter pipes, four miles in length, referred to as the dual pipelines. Enbridge stated that pursuant to the Replacement Project, the four-mile segment of the dual pipelines will be replaced with a single, 30-inch-diameter pipe that will be located within a concrete-lined tunnel beneath the lakebed of the Straits (the tunnel). Enbridge asserted that the Replacement Project will provide greater protection from any release of liquid petroleum to the aquatic environment because compared to the dual pipelines that are currently situated on the top of the lakebed and vulnerable to a vessel anchor strike, the Replacement Project will relocate the Straits Line 5 segment to a concrete-lined tunnel deep beneath the lakebed. Enbridge noted that the construction of the tunnel is the subject of separate applications before other state and federal agencies, including EGLE [the Michigan Department of Environment, Great Lakes, and Energy] and the United States (U.S.) Army Corps of Engineers (USACE).

> Enbridge stated that beginning in 2017, it entered into a series of agreements with the State of Michigan relating to the relocation of the Straits Line 5 segment to the tunnel. Enbridge noted that the Michigan Legislature enacted Act 359 [2018 PA 359] in December 2018, which created MSCA and delegated to MSCA the authority to enter into agreements pertaining to the construction, operation, and maintenance of the tunnel to house the replacement pipe segment. Thus, Enbridge asserted that its request for Commission approval of the Replacement Project does not include "authorization to design, construct, or operate the tunnel" because "[t]he tunnel will be designed, constructed, and maintained pursuant to the 'Tunnel Agreement' entered between the MSCA and Enbridge pursuant to Act 359."

> Enbridge explained that, pursuant to the Tunnel Agreement, the tunnel will be constructed in the subsurface lands beneath the lakebed of the Straits within the

easement issued by the Michigan Department of Natural Resources (DNR) to MSCA in 2018 (2018 easement) and pursuant to the assignment of certain rights under that easement by MSCA to Enbridge. Enbridge stated that the tunnel will be constructed in accordance with all required governmental permits and approvals. Enbridge averred that it will enter into a 99-year lease with MSCA for the use of the tunnel to operate and maintain the Straits Line 5 replacement pipe segment.

In its application, Enbridge seeks Commission approval to operate and maintain the replacement pipe segment located within the tunnel as part of Line 5 under Act 16. Enbridge stated that once the new four-mile pipe segment is placed into service within the tunnel, service on the dual pipelines will be discontinued. [*In re Enbridge Energy, Ltd Partnership*, order of the Public Service Commission, entered December 1, 2023 (Case No. U-20763), pp 16-18 (record citations and footnotes omitted).]

The PSC ultimately approved Enbridge's application in a 349-page opinion and order. The approval was conditioned on, among other things, Enbridge's "obtaining the required governmental permits and approvals" and providing "the Mackinac Straits Corridor Authority with a detailed risk management plan." *Id*. at 347.

Line 5 as a whole has been considered by the Michigan Supreme Court. The PSC granted Enbridge's predecessor the authority for Line 5 as a whole on March 31, 1953. *In re Application of Lakehead Pipe Line Co, Inc*, order of the Public Service Commission, entered March 31, 1953 (Case No. D-3903-53.1). The 1953 order rejected as "without merit" the contention that the pipeline was "not in the public interest." *Id*. at 8. Subsequently, in *Lakehead Pipe Line Co v Dehn*, 340 Mich 25; 64 NW2d 903 (1954), the Michigan Supreme Court considered a challenge to condemnation proceedings undertaken in furtherance of the construction of the pipeline. The Court upheld the condemnation proceedings and stated that the statute relied upon by the pipeline company allowed for condemnation only for "a public use benefiting the people of the State of Michigan." *Id*. at 30, 37, 42.

In November 2017, an agreement ("the First Agreement") was signed between Enbridge and the State of Michigan. The First Agreement stated that "the continued operation of Line 5 through the State of Michigan serves important public needs by providing substantial volumes of propane to meet the needs of Michigan citizens, supporting businesses in Michigan, and transporting essential products, including Michigan-produced oil to refineries and manufacturers." It stated that the agreement was "intended to further protect ecological and natural resources held in public trust by the State of Michigan" and would "serve Enbridge's interest by providing clarity as to State's expectations concerning the safety and integrity of Line 5." Among other things, the First Agreement required Enbridge to assess the possibility of a replacement for the dual pipelines.

In October 2018, Enbridge and the State of Michigan entered into another agreement ("the Second Agreement"). The Second Agreement stated that, according to alternatives considered by Enbridge,

construction of a tunnel beneath the lakebed of the Straits connecting the upper and lower peninsulas of Michigan, and the placement in the tunnel of a new oil pipeline, is a feasible alternative for replacing the Dual Pipelines, and that alternative would essentially eliminate the risk of adverse impacts that may result from a potential oil spill in the Straits. . . .

The Second Agreement stated that the State and Enbridge would pursue agreements for the construction of a tunnel "in which a replacement for the Dual Pipelines could be located," and it further stated, "Enbridge agrees that following completion of the Straits Tunnel and after the Line 5 Straits Replacement Segment is constructed and placed into service by Enbridge within the Straits Tunnel, Enbridge will permanently deactivate the Dual Pipelines."

In accordance with the agreements, the Legislature enacted 2018 PA 359 ("Act 359"), effective December 12, 2018, which authorized the creation of the MSCA and spoke to the creation of a utility tunnel under the Straits. Act 359 defines "utility tunnel" as

a tunnel joining and connecting the Upper and Lower Peninsulas of this state at the Straits of Mackinac for the purpose of accommodating utility infrastructure, including, but not limited to, pipelines, electric transmission lines, facilities for the transmission of data and telecommunications, all useful and related facilities, equipment, and structures, and all necessary tangible or intangible real and personal property, licenses, franchises, easements, and rights-of-way. [MCL 254.324(e).]

The Act further states:

The Mackinac Straits corridor authority is created within the state transportation department. The Mackinac Straits corridor authority is a state institution within the meaning of section 9 of article II of the state constitution of 1963, and an instrumentality of this state exercising public and essential governmental functions. The creation of the Mackinac Straits corridor authority and the carrying out of the Mackinac Straits corridor authority's authorized purposes are public and essential governmental purposes for the benefit of the people of this state and for the improvement of the health, safety, welfare, comfort, and security of the people of this state, and these purposes are public purposes. The Mackinac Straits corridor authority will be performing an essential governmental function in the exercise of the powers conferred upon it by this act. [MCL 254.324b(1).]

Act 359 indicates that the MSCA is empowered to enter into agreements for a utility tunnel. MCL 254.324d.

Soon after the enactment of Act 359, on December 19, 2018, Enbridge and the State entered into yet another agreement ("the Third Agreement"). The Third Agreement stated that Enbridge would construct and maintain "the Straits Line 5 Replacement Segment" within the tunnel at its own expense. The Third Agreement also stated that, provided that Enbridge complied with the three agreements, the original easement granted in 1953, and all other applicable laws, "the State agrees that . . . [t]he replacement of the Dual Pipelines with the Straits Line 5 Replacement

Segment in the Tunnel is expected to eliminate the risk of a potential release from Line 5 at the Straits." The director of the Department of Natural Resources and the director of the Department of Environmental Quality were signatories to the Second and Third Agreements. Also on December 19, 2018, Enbridge and the MSCA entered into a "Tunnel Agreement." The Tunnel Agreement stated that Enbridge would construct the tunnel and that the MSCA would "issue a lease to Enbridge authorizing it to operate and maintain the 'Straits Line 5 Replacement Segment' within the Tunnel."

## B. ENBRIDGE'S MOTION IN LIMINE

After Enbridge sought approval for the pipeline project by way of the current PSC proceedings, it filed a motion in limine, arguing that the administrative law judge ("ALJ") considering the motion should direct

> that the following issues be excluded from this proceeding: (1) the construction of the tunnel, (2) the environmental impact of the tunnel construction, (3) the public need for and continued operation of Line 5, (4) the current operational safety of Line 5, (5) climate change, and (6) the intervenors' climate agendas; and [also] direct that the proceeding be limited to whether: (A) there is a public need for the Project, (B) the replacement pipe segment is designed and routed in a reasonable [sic], and (C) the construction of the replacement pipe segment will meet or exceed current safety and engineering standards.

The ALJ initially ruled that the motion in limine was:

> 1. Denied as it pertains to the Utility Tunnel.

> 2. Granted regarding the operational aspects, including the public need and safety, of the entirety of Line 5.

> 3. Granted as it pertains to the review of the project under MEPA does not entail [sic] the environmental effects of greenhouse gas emissions and climate change.

The ALJ ruled that "under Act 16 the proper inquiry for a proposal involving a segment of an existing pipeline [encompasses only] that segment, as opposed to the entire pipeline system," and concluded that "evidence concerning the entirety of Line 5 is irrelevant." After various intervenors appealed the ruling of the ALJ, the PSC remanded the matter to the ALJ because Governor Gretchen Whitmer had, on November 13, 2020, stated that the previously granted 1953 easement to operate the dual pipelines in the bottomlands of the Straits was revoked and ordered that the

dual pipelines cease to operate."[3]  The Commission indicated that this action might impact the ALJ's ruling on the motion in limine.

On remand, the ALJ stated that even *if* the notice of revocation of the 1953 *easement* were to be given immediate effect, this would not serve to revoke "the right to operate Line 5 under the 1953 Order."  The ALJ stated:

> [T]o accept the Notice [of revocation] as requiring a reexamination of the public need of Line 5 under Act 16, along with its operational and safety aspects, would result in a diminishment of [an] existing license under §92(1) of the APA [Administrative Procedures Act, MCL 24.201 *et seq*.] without providing the procedural due process protections afforded a licensee.  Accordingly, the Notice cannot be used to expand the scope of this case to include an examination or determination of the public need for Line 5, or any aspect of its operation and safety.  Rather, the Notice can only be considered in the context of the Act 16 criteria as applied to the proposal to relocate the dual pipelines from the bottomlands [i.e., the surface of the lakebed] to the proposed Utility Tunnel.

The ALJ stated that the notice of revocation did not change the 1953 authority under which Enbridge operates Line 5 as a whole and that "the operation and safety of that system is outside the conduct subject to review under MEPA" because the conduct at issue was the Replacement Project.

---

[3] The attempt to revoke the easement for the dual pipelines has a complicated history.  The governor filed an action in the Ingham County Circuit Court to enforce her attempted revocation of the easement, Enbridge removed the lawsuit to federal court and sought a declaration that the revocation was unlawful, and the governor sought to remand the case back to the state court.  See *Nessel on behalf of People of Michigan v Enbridge Energy Ltd Partnership*, 104 F4th 958, 962 (CA 6, 2024), cert pending (discussing the history).  The United States District Court for the Western District of Michigan determined that the dispute regarding revocation of the 1953 easement involved substantial federal interests, such as an application of the federal Pipeline Safety Act, see, e.g., 49 USC 60104, and that federal court was the appropriate forum.  *Michigan v Enbridge Energy Ltd Partnership*, 571 F Supp 3d 851, 859, 862 (WD Mich, 2021).  "Soon thereafter [i.e., after the federal district court's ruling], the Governor voluntarily dismissed her case."  See *Nessel on behalf of People of Michigan*, 104 F4th at 963.  However, the AG filed another lawsuit in state court, seeking to "enjoin Enbridge's continued operation of Line 5 based on alleged violations of three state laws: the public-trust doctrine, common-law public nuisance, and the Michigan Environmental Protection Act."  See *id*. at 961.  Enbridge then sought to remove the case to federal court, but the federal court deemed the removal attempt untimely.  *Id*. at 963, 968, 971-972.  Accordingly, the lawsuit remains pending in the Ingham Circuit Court.

The ALJ ruled:

Based on the foregoing, in 1953 the Commission issued an Act 16 license that authorized the construction, operation, and maintenance of Line 5. That license remains in effect and can only be subject to the actions listed in §92(1) of the APA after the notice and hearing provisions of the APA are satisfied. Accordingly, neither the filing of the Application at issue in this case, nor the State's Notice that the easement under which the dual pipelines were sited and operate is revoked and terminated as of May 13, 2021, allows for a reexamination of the public need for Line 5, or its operational and safety aspects, under Act 16. Rather, the Notice is relevant under the proper Act 16 review of the project: whether a public need exists to replace the existing dual pipelines on Great Lakes bottomlands in the Straits of Mackinac with a single pipeline in a proposed Utility Tunnel.

The Commission's jurisdiction under Act 16 is over the proposal to relocate the existing pipelines into the Utility Tunnel, and a component of that jurisdiction is examining the environmental impacts of that conduct, consistent with the judicial and Commission construction of that term, under MEPA. The issuance of the Notice does not expand the MEPA inquiry to include the environmental effects of the operation and safety of Line 5, or those arising from the production, refinement, and consumption of the oil transported on Line 5.

Various intervenors appealed the ALJ's revisited ruling. Of note, however, is that the MSCA supported the ALJ's ruling. The PSC, in its subsequent order, stated:

[I]n order to grant an application under Act 16, the Commission must find that: (1) the applicant has demonstrated a public need for the proposed pipeline, (2) the proposed pipeline is designed and routed in a reasonable manner, (3) the construction of the pipeline will meet or exceed current safety and engineering standards, and (4) the project complies with the requirements of MEPA. [*In re Enbridge Energy, Ltd Partnership*, order of the Public Service Commission, entered April 21, 2021 (Case No. U-20763), p 57.]

The Commission noted that the "impetus" for Enbridge's application was Act 359. *Id.*[4]

In affirming the ALJ's ruling excluding evidence about the need for the entirety of Line 5, the Commission stated:

In the 1953 order, the Commission approved the construction, maintenance, and operation of Line 5, finding that Line 5 was fit for the purpose of carrying and transporting crude oil and petroleum as a common carrier in interstate and foreign commerce. In the 1953 order the Commission stated "[i]t appears to this Commission that in times of national emergency delivery of crude oil for joint

---

[4] This Court has considered and rejected a challenge to Act 359. See *Enbridge Energy, LP v State*, 332 Mich App 540; 957 NW2d 53 (2020).

-12-

defense purposes would be greatly enhanced by operation of the proposed pipe line." 1953 order, p. 4. Denmark Township moved for denial of the application on grounds that the pipeline was not in the public interest. The Commission found the motion to be without merit, and it was denied. *Id.*, p. 8. The Commission found that the proposed Line 5 met the requirements of Act 16, and Lakehead (Enbridge's predecessor) received permission to construct and operate the pipeline. Subsequently, in *Lakehead*, 340 Mich at 37, the Michigan Supreme Court held that construction and operation of Line 5 was "for a public use benefiting the people of the State of Michigan." Neither Act 16, nor Rule 447, nor Commission precedent require the Commission to make findings with respect to the length of time that an approved pipeline may operate, and such findings are not made in this order. Indeed, while intervenors argue that the issue of whether Line 5 will continue in operation indefinitely (as Enbridge has alleged) is a question of fact that should be tested, what is ignored by these parties is that whether Enbridge holds the legal right to operate the other 641 miles of Line 5 is not a question of fact but rather of law. *Nothing in the Commission's 1953 order set a termination date for the operation of Line 5*, and no party disputes Enbridge's legal authority to continue to operate the other 641 miles not at issue in this proceeding. [*In re Enbridge Energy, Ltd Partnership*, order of the Public Service Commission, entered April 21, 2021 (Case No. U-20763), pp 60-61 (emphasis added; footnote omitted).]

The PSC also noted that its prior precedent did not support reexamining the entire length of a pipeline when a company proposed to replace only a segment. *Id.* at 61-62. It stated:

[W]hen deciding an application to construct or relocate pipeline, the Commission has never examined any portion of existing pipeline that is interconnected with the segment that is proposed in the applicant's project but not within the proposed route; nor has it examined how the proposed pipeline segment could affect the lifespan of an existing interconnected pipeline system. [*Id.* at 62.]

The Commission stated that the pertinent issues were whether there was a public need for the tunnel and underground pipeline, whether this "Replacement Project" was designed and routed reasonably, and whether it met or exceeded safety and engineering standards. *Id.* at 63. It said that "[t]he public need for the existing portions of Line 5 has been determined." *Id.*

The Commission then considered MEPA. MCL 324.1705(2), a provision of MEPA, states:

In administrative, licensing, or other proceedings, and in any judicial review of such a proceeding, the alleged pollution, impairment, or destruction of the air, water, or other natural resources, or the public trust in these resources, shall be determined, and conduct shall not be authorized or approved that has or is likely to have such an effect if there is a feasible and prudent alternative consistent with the reasonable requirements of the public health, safety, and welfare.

The PSC said that, similarly to the analysis regarding public need, MEPA analysis "does not extend to the entirety of Line 5, including the 641 miles of Line 5 outside of the proposed Replacement Project, but only to" the proposed embedded pipeline to be located in the tunnel. *In re Enbridge*

-13-

*Energy, Ltd Partnership*, order of the Public Service Commission, entered April 21, 2021 (Case No. U-20763), p 64. It said that "some would narrowly constrain the review of pollution to the construction of the tunnel and pipeline," but concluded that this constraint was improper and that the MEPA analysis must encompass "the product being shipped through the Replacement Project." *Id*. It said that the pipeline segment under consideration "would involve hydrocarbons that may result in GHG pollution that must be subject to MEPA review." *Id*. at 67. The Commission said that, in light of the governor's attempt to revoke the easement for the dual pipelines, it was "unwilling to exclude evidence under MEPA that compares the pollution, impairment, or destruction attributable to an operating 4-mile pipeline segment in the Straits with non-operational 4-mile dual pipeline segments." *Id*. It said that, at this early stage in the case, it wanted to hear evidence about eventualities should the dual pipelines be shut down. *Id*. The PSC recognized that, "while Enbridge would retain the right to operate the other 641 miles of Line 5, it may not be able to ship product through the Straits by pipeline once the Notice is in force without the authorization that is sought in this case," *id*. at 68, and it added that "questions on the feasibility and prudence of alternatives—both in terms of alternative pipeline and non-pipeline shipping arrangements and alternatives to the products being shipped—are inherently questions of fact well suited to the development of record evidence," *id*. at 69. It emphasized that how to make proper comparisons of alternatives for the Replacement Project was a point yet to be determined. *Id*.

## C. PSC'S FINAL ORDER AND EVALUATION OF ALTERNATIVES

The contested case then proceeded, with the submission of testimony and evidence. In its final order, the PSC concluded that there was a need for the Replacement Project, stating, "[T]he Commission finds that . . . the First, Second, and Third Agreements and Act 359 demonstrate that there is a public purpose and public need to replace the dual pipelines with the Replacement Project." *In re Enbridge Energy, Ltd Partnership*, order of the Public Service Commission, entered December 1, 2023 (Case No. U-20763), p 300. It noted that there was a "public need for the products shipped through the Straits Line 5 segment." *Id*. at 302. The PSC determined:

[T]he Commission finds that the Replacement Project essentially eliminates the risk of adverse impacts that may result from a potential release from Line 5 at the Straits and protects unique ecological and natural resources that are of vital significance to the State and its residents, to tribal governments and their members, to public water supplies, and to the regional economy . . . .

In conclusion, the Commission finds that Enbridge has established both the public need for the products to be shipped through the Replacement Project and the need to relocate the Straits Line 5 segment inside the tunnel, and as such, has established the public need for the Replacement Project. [*Id*. at 305.]

With regard to its MEPA analysis, the Commission first stated that certain environmental concerns would be addressed by way of permitting decisions by other agencies:

As an initial matter, the Commission agrees with the Staff[5] that several potential environmental impairments resulting from the construction of the Replacement Project fall in the regulatory purview of other state and federal agencies and will be addressed by separate permitting decisions. For example, [certain] witnesses . . . asserted that the discharge of wastewater in the Great Lakes during construction of the tunnel and regular operations of the Replacement Project is likely to affect the Great Lakes' ecosystem. The Staff noted that the NREPA [Natural Resources Environmental Protection Act] Part 31 permit "establishes parameters for authorized discharge, including quantity and composition." . . . The Commission agrees with the Staff that Enbridge's compliance with these permit requirements should minimize potential environmental impacts from construction and operation of the Replacement Project. [*Id*. at 328.]

The Commission went on to state, however, that the Replacement Project would have some environmental impacts not addressed by other permitting decisions and not adequately addressed by Enbridge's plans. Those impacts were "increased noise, dust/particulates, and light from construction, and impacts to surface water, local residents, flora, fauna, air quality, groundwater, surface soils, and vegetations." *Id*. at 329. The Commission agreed with the recommendation of a PSC Staff witness that "these environmental impacts should be specifically addressed in Enbridge's final mitigation plans to minimize the environmental impairments." *Id*. It characterized the impairments as "environmental impairments pursuant to MEPA." *Id*. The PSC also recognized that construction of the Replacement Project would involve GHGs and that Line 5 as a whole involves GHGs. *Id*. at 330.

The PSC stated:

Once the Commission concludes that the proposed conduct, i.e., the Replacement Project, is likely to pollute, impair, and destroy natural resources, the Commission may not approve the action if there is a feasible and prudent alternative. [*Id*. at 331.]

The PSC considered six (at least theoretically possible) alternatives presented in a report by "Dynamic Risk," two alternatives presented by the MSCA, and six alternatives presented by PSC Staff. The Dynamic Risk alternatives were (1) a new pipeline that does not cross the Great Lakes; (2) use of existing pipeline infrastructure that does not cross the Great Lakes; (3) decommissioning Line 5 and using rail, trucks, or barges to transport Line 5 products from Wisconsin to Canada without the products crossing the Straits; (4) using a pipeline in a trench or "sealed annulus tunnel"[6] to cross the Straits; (5) continued operation of the dual pipelines; and (6) using alternative

---

[5] In PSC contested cases, "PSC Staff" provides testimony and evidence to help develop the issues.

[6] This tunnel would be somewhat different in character from the tunnel in the Replacement Project, but the PSC stated that the tunnels were largely equivalent in terms of environmental risk, with the Enbridge design having an advantage in terms of workers' future ability to inspect possible pipeline issues as they might arise. See *id*. at 340.

transportation such as rail or trucks to transport Line 5 product through the Straits if the dual pipelines were shut down.[7]  *Id*. at 331-335.  The MSCA alternatives were (1) suspending a replacement pipe segment from the Mackinac Bridge and (2) suspending a replacement pipe from a new suspension bridge.  *Id*. at 335-336.  The PSC Staff alternatives were (1) taking no action and allowing the dual pipelines to continue to be used, (2) using an "Open-Cut Alternative" for a pipeline,[8] (3) using a "horizontal directionally drilled" (HDD) method to install a pipeline across or under the Straits, (4) protecting the dual pipelines with rock armoring, (5) using alternative transportation for Line 5 products "in a hypothetical post-Line 5 shutdown scenario"; and (6) using alternative products from those transported by Line 5.  *Id*. at 336.

The PSC concluded that Dynamic Risk option 1 would involve putting a pipeline across numerous streams and "231 miles of wetlands" and other sensitive areas and would present a greater safety risk than tunneling.  *Id*. at 338.  The PSC also concluded that rail transportation as discussed in option 3 was feasible;[9] however, it carried a greater likelihood of environmental harm because, in part, rail transportation presented a higher safety risk than the Replacement Project and "[r]ail transportation of Line 5 product will cross 11 rivers, 11 streams, 6 drainage canals, 6-7 miles of wetlands, 14 protected areas, and 72 miles of highly populated areas in Michigan."  *Id*. at 338-339.  It noted that the trench analyzed in option 4 would be less safe than the Replacement Project and that the "sealed annulus tunnel" analyzed in option 4 would be largely equivalent in safety to the Replacement Project but that the Enbridge design had an advantage in terms of workers' future ability to inspect possible pipeline issues as they might arise.  *Id*. at 339-340.  As for option 5, the Commission stated that the dual pipelines posed a much greater risk than the Replacement Project.  *Id*. at 340. For option 6, the PSC stated that although rail transport would be feasible, it presented a greater risk than tunneling.  *Id*. at 339, 341.  It also stated that option 2 was not feasible and was equivalent to abandonment of any pipeline, leaving rail as the possibility to transport Line 5 product.  *Id*. at 338, 341.

Regarding the MSCA alternatives, the PSC stated:

> The Commission also reviewed the two alternatives presented by MSCA. The Commission agrees with MSCA that it is not feasible to suspend a replacement pipe segment from the Mackinac Bridge. . . .  In addition, the Commission agrees with MSCA that while construction of a suspension bridge to house a replacement pipe segment is feasible, it has "significant disadvantages compared to a tunnel" and is therefore imprudent. [*Id*. at 341.]

---

[7] The Dynamic Risk report, for alternative 6, took into account whether Line 5 as a whole would be abandoned "if the fragmented segments [i.e., the segments fragmented by the decommissioning of the Straits segment] could not be effectively used."

[8] This involves trenching or partial trenching to lay a pipeline.

[9] Nevertheless, the PSC agreed with Dynamic Risk that, "tanker truck, oil tanker, and barge transportation are not feasible."  *Id*. at 338.

As for the Staff options, the PSC stated that the open-cut alternative (option 2) presented more of a risk of release than the Replacement Project and that the HDD method (option 3) was not feasible in light of current technical capabilities. *Id*. at 342. As for option 4 (rock armoring), the PSC stated that it would present more safety concerns than the Replacement Project. *Id*. at 342-343. Regarding option 1 (continued operation of the dual pipelines), the PSC noted that this was not a safe alternative. *Id*. at 346-347. As for option 5, the PSC stated that rail and truck transportation would result in greater GHGs than using a pipeline. *Id*. at 346. It made an apparent reference to option 6 by stating that "a shutdown of the dual pipelines *would not immediately alter demand for the products shipped on Line 5*, and consequently the modes of transportation for crude oil and NGLs would shift to rail and truck." *Id*. at 345 (emphasis added).

The PSC concluded: "[T]he Commission finds that after a review of the record evidence, there are no feasible and prudent alternatives to the Replacement Project pursuant to MEPA." *Id*. at 347. The Commission ordered:

> A. Enbridge Energy, Limited Partnership's application is approved as set forth in the order.
>
> B. The route and location of Enbridge Energy, Limited Partnership's Straits Line 5 Replacement Segment is approved conditioned upon the company obtaining the required governmental permits and approvals. Significant changes to the design of the tunnel that are completed subsequent to this approval, including the addition of third-party utilities, shall be considered by the Commission to be inconsistent with the approval of this application and would require further application to, and approval by, the Commission.
>
> C. Prior to construction of the tunnel, Enbridge Energy, Limited Partnership shall provide the Mackinac Straits Corridor Authority with a detailed risk management plan. The plan shall include a description of the planned geotechnical test bores and frequency of probe-hole testing ahead of the tunnel boring machine and should include reporting of both test-bore data and probe-hole data in real time so that the State of Michigan can assess risks and construction plan modifications based on the data. The plan should also include inspections for concrete cast sections prior to moving them into the tunnel and after being put into place, placement of gaskets, regular analyses of bentonite mix properties, and changes in slurry pressure. Deviations from and modifications to the plan during the construction process should be reported by Enbridge Energy, Limited Partnership and available for public review.
>
> D. Enbridge Energy, Limited Partnership shall implement procedures for low-hydrogen welding for all mainline girth welds, shall ensure that the procedures require both preheat and inter-pass temperature requirements, and shall ensure that the mainline girth welds are nondestructively tested using automatic phased array ultrasonic testing methods as proposed by the Commission Staff.

The Commission reserves jurisdiction and may issue further orders as necessary. [*Id*. at 347-348.]

## II. ANALYSIS

## A. PSC'S RULING ON THE MOTION IN LIMINE

Intervenors the Tribes, Michigan Environmental Council, Tip Of The Mitt Watershed Council, National Wildlife Federation, For Love Of Water, Environmental Law & Policy Center, and Michigan Climate Action Network argue that the PSC erred because it did not allow intervenors to introduce evidence regarding the public need for the continued operation of Line 5, yet, in its final order, it referred to this alleged public need. Intervenors contend that the PSC acted inconsistently and take issue with other aspects of the PSC's ruling regarding the motion in limine.

### 1. STANDARDS OF REVIEW

MCL 462.26(8) states, "In all appeals under this section the burden of proof shall be upon the appellant to show by clear and satisfactory evidence that the order of the commission complained of is unlawful or unreasonable." Pursuant to MCL 462.25, practices and services prescribed by the PSC are presumed, prima facie, to be lawful and reasonable. See also *Mich Consol Gas Co v Pub Serv Comm*, 389 Mich 624, 635-636; 209 NW2d 210 (1973). To establish that a PSC order is unlawful, the appellant must show that the PSC failed to follow a statutory requirement or abused its discretion in the exercise of its judgment. *In re MCI Telecom Complaint*, 460 Mich 396, 427; 596 NW2d 164 (1999). Also, the "hurdle of unreasonableness" is high. *Id*. "Within the confines of its jurisdiction, there is a broad range or 'zone' of reasonableness within which the PSC may operate." *Id*.

A final order of the PSC must be authorized by law and be supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28; *In re Consumers Energy Co*, 279 Mich App 180, 188-189; 756 NW2d 253 (2008).

A reviewing court "gives due deference to the PSC's administrative expertise and is not to substitute its judgment for that of the PSC." *Attorney General v Pub Serv Comm No 2*, 237 Mich App 82, 88; 602 NW2d 225 (1999). Issues of statutory interpretation are reviewed de novo. *In re Complaint of Rovas*, 482 Mich 90, 102; 754 NW2d 259 (2008). A reviewing court should give an administrative agency's interpretation of statutes it is obliged to execute respectful consideration, but not deference. *Id*. at 108.

Whether the PSC exceeded the scope of its authority is a question of law subject to review de novo. *In re Complaint of Pelland Against Ameritech Mich*, 254 Mich App 675, 682; 658 NW2d 849 (2003).

In *Nat'l Wildlife Federation v Dep't of Environmental Quality (No. 1)*, 306 Mich App 336, 342; 856 NW2d 252 (2014), the Court stated that an administrative tribunal's "evidentiary decisions are reviewed for an abuse of discretion."

### 2. DISCUSSION

We find no basis upon which to reverse the PSC's final order, in light of (1) prior statements made by the PSC (in its April 21, 2021 order), which reflected a finding that the public need for

Line 5 had already been established; (2) the incorporation of this April order into the final order; (3) the deferential standard of review to be applied by this Court; and (4) the fact that the PSC did eventually allow evidence regarding the need for Line 5 to be introduced.[10]

The Michigan Legislature vested the PSC with the power to regulate the transportation of "crude oil or petroleum, or any of the products thereof, or carbon dioxide substances, by or through pipe line or lines. . . ." See MCL 483.3. Mich Admin Code, R 792.10447(1)(c), states, in applicable part, that a "corporation, association, or person conducting oil pipeline operations within the meaning of 1929 PA 16 . . . that wants to construct facilities to transport crude oil or petroleum or any crude oil or petroleum products as a common carrier" "shall file an application with the commission for the necessary authority to do" so. The applicant must set forth "[a] full description of the proposed new construction or extension, including the manner in which it will be constructed." Mich Admin Code, R 792.10447(2)(e).

In a 2002 case, the PSC explained that it evaluates public need when considering proposed pipelines:

> Pursuant to 1929 PA 16, MCL 483.1 et seq., (Act 16) the Commission is granted the authority to control and regulate oil and petroleum pipelines. Act 16 provides the Commission with broad jurisdiction to approve the construction, maintenance, operation, and routing of pipelines delivering liquid petroleum products for public use. *Generally, the Commission will grant an application pursuant to Act 16 when it finds that the applicant has demonstrated a public need for the proposed pipeline* and that the proposed pipeline is designed and routed in a reasonable manner, which meets or exceeds current safety and engineering standards. [*In re Wolverine Pipe Line Co*, order of the Public Service Commission, entered July 23, 2002 (Case No. U-13225), pp 4-5 (emphasis added).]

As stated in *Ass'n of Businesses Advocating Tariff Equity v Pub Serv Comm*, 219 Mich App 653, 662; 557 NW2d 918 (1996), "[T]his Court ordinarily will uphold the PSC's interpretation of its own orders as long as the interpretation is reasonable or supported by the record." See also *In re MCI Telecommunications Corp Complaint*, 240 Mich App 292, 303; 612 NW2d 826 (2000). No party argues that the Commission's adopted three-part "test" of need, reasonableness of design and routing, and safety is unreasonable. As such, public need in general was at issue.

However, Rule 447(1)(c) refers to the construction of facilities, and Rule 447(2)(e) refers to a description of the "*new construction or extension*." (Emphasis added.) Enbridge, in its application, was not seeking approval for the construction of Line 5. It was seeking approval for the Replacement Project.

---

[10] The PSC allowed such evidence as part of its MEPA analysis but ended up also considering it for the "public need" issue.

As stated in *United Parcel Serv, Inc v Bureau of Safety & Regulation*, 277 Mich App 192, 202; 745 NW2d 125 (2007), "The rules of statutory construction apply to both statutes and administrative rules." The panel in that case went on to state:

> When interpreting a statute, our primary goal is to ascertain and give effect to the intent of the Legislature. We must first look to the specific language of the statute or rule, and if the plain and ordinary meaning of the language is clear, judicial construction is neither necessary nor permitted. We may not read into a statute or rule that which is not within the manifest intention of the Legislature as gathered from the statute or rule itself. *Only where the language under review is ambiguous may a court properly go beyond the words of the* statute or *administrative rule to ascertain the drafter's intent.* [*Id*. at 202 (quotation marks and citations omitted; emphasis added).]

It is difficult to conclude that the PSC abused its discretion, see *Nat'l Wildlife Federation*, 306 Mich App at 342, by concluding that the need for Line 5 as a whole was simply not a salient issue in the proceedings because the application was for the Replacement Project, not for the construction of Line 5 as a whole. Significantly, the Commission recognized the concern that "a pipeline operator who knows that hundreds of miles of approved, existing, and reliable pipeline will be put at risk through the filing of an application to improve a few miles of that pipeline may be unlikely to decide to make those improvements." *In re Enbridge Energy, Ltd Partnership*, order of the Public Service Commission, entered April 21, 2021 (Case No. U-20763), pp 69-70.

Certain intervenors argue that the PSC's ruling on the motion in limine violated the APA and the Michigan Rules of Evidence. MCL 24.272(3), a provision of the APA, states that "[t]he parties shall be given an opportunity to present oral and written arguments on issues of law and policy and an opportunity to present evidence and argument on issues of fact." In *Smith v Lansing Sch Dist*, 428 Mich 248, 257; 406 NW2d 825 (1987), the Court said that this statute "require[s] affording the opportunity to present evidence on issues of fact only when such issues exist." MRE 401, at the time of the decision on the motion in limine, stated, " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[11] Again, there was no abuse of discretion by virtue of the PSC's evidentiary ruling, given that the application at issue was for the Replacement Project. *Nat'l Wildlife Federation*, 306 Mich App at 342.

---

[11] MRE 401 now states:

> Evidence is relevant if:
>
> (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and
>
> (b) the fact is of consequence in determining the action.

Intervenors contend that the PSC acted inconsistently and violated its own rules by essentially concluding in its final order that there was a public need for Line 5 as a whole. The PSC stated the following:

> In the present case, the public need is not based on the need for additional capacity, but on the ongoing reliance on the current capacity of the dual pipelines, even as other sourcing options emerge. Furthermore, the Commission finds that there is substantial evidence on the record in the present case to show that if the dual pipelines are damaged, deemed inoperable due to safety concerns, or [shut down], *Line 5 in Michigan may be abandoned in full* or in part, which will require higher-risk and costlier alternative fuel supply sources and transportation to Michigan customers than what is proposed in the Replacement Project. . . . *Thus, the Commission finds that there is a public need for the products shipped through the Straits Line 5 segment.* The evidence in this case, in addition to the official findings of public need and public benefit identified in Act 359 and the First, Second, and Third Agreements, clearly supports a finding of public need for the Replacement Project. [*In re Enbridge Energy, Ltd Partnership*, order of the Public Service Commission, entered December 1, 2023 (Case No. U-20763), p 302 (emphasis added).]

At first blush, it does seem that the Commission violated its own ruling by incorporating references to the need for Line 5 as a whole into its decision. However, in its April 2021 ruling on the motion in limine, the Commission stated:

> In the instant case, the Commission finds that the first issue is whether there is a public need to carry out the Replacement Project, a project to replace the dual pipelines with a new pipeline in a tunnel, and does not concern approved, existing pipeline that is merely interconnected with the segment that is the subject of the application. *The public need for the existing portions of Line 5 has been determined.* The public need for the Replacement Project has yet to be determined. [*In re Enbridge Energy, Ltd Partnership*, order of the Public Service Commission, entered April 21, 2021 (Case No. U-20763), p 63.]

In the April 2021 order, the Commission referred to the 1953 order and Supreme Court *Lakehead* decision and stated that "[n]othing in the Commission's 1953 order set a termination date for the operation of Line 5, and no party disputes Enbridge's legal authority to continue to operate the other 641 miles not at issue in this proceeding." *Id*. at 60-61. The PSC's comments in the December order must be viewed in the context of this April order, which the PSC, in fact, incorporated into the December order. *In re Enbridge Energy, Ltd Partnership*, order of the Public Service Commission, entered December 1, 2023 (Case No. U-20763), p 292. In large part, what the PSC was stating in the December order was that the *already-established* public need for Line 5 was a piece of the puzzle demonstrating a need for the Replacement Project.

In addition, the Commission stated that there was a need for the Replacement Project because the dual pipelines posed an oil-spill risk, whereas the proposed tunnel alternative posed virtually no risk of an oil spill. *Id*. at 303-305. It cited the testimony of Travis Warner, a member

of the PSC Staff, who noted that the Replacement Project would "substantially reduce" "if not eliminate" the risk of an oil spill in the Straits and who added:

> At this time, there is no certainty as to how long the existing Dual Pipelines would continue to operate if the Replacement Project is not completed. This uncertainty creates the potential for perpetual and unnecessary risk for an undetermined length of time into the future. Based on the information currently known, Staff determined that support of the Replacement Project is prudent, in the public interest, and will reduce the risk of contamination of the Great Lakes.

The Commission's analysis reflected a heavy focus on the need for the Replacement Project as an alternative to the dual pipelines and accorded with the language of Rule 447(1)(c). In other words, that Enbridge has the authority to operate Line 5 has already been established, and the public will be served by the Replacement Project because of the risk posed by the continued use of the dual pipelines.[12]

On balance, we conclude that affirmance is appropriate, not only because of the wording of the April order and the deferential standard of review but also because, as will be discussed more fully *infra*, the Commission, despite its ruling on the motion in limine, did in fact end up allowing intervenors the opportunity to present evidence of possible alternatives for Line 5. Moreover, in its analysis of the "public need" issue, the Commission considered the viability of those alternatives. See *In re Enbridge Energy, Ltd Partnership*, order of the Public Service Commission, entered December 1, 2023 (Case No. U-20763), pp 293-296, 300-302.

We note, lastly, that For Love of Water argues about the public trust. It refers to the fact that, "[u]nder common law, the state owns and holds the waters and bottomlands of the Straits and Great Lakes in public trust." As stated in *Glass v Goeckel*, 473 Mich 667, 678; 703 NW2d 58 (2005), with regard to the public trust doctrine, "[U]nder longstanding principles of *Michigan's common law*, the state, as sovereign, has an obligation to protect and preserve the waters of the Great Lakes and the lands beneath them for the public." (Emphasis added.) However, the PSC is a "creature of the Legislature" and has no common-law powers; it "possesses only that authority bestowed upon it by statute." *Union Carbide Corp v Pub Serv Comm*, 431 Mich 135, 146; 428 NW2d 322 (1988). All its power must derive from statutes. *Id*. As such, the reliance by For Love of Water on the public trust doctrine is misplaced.

---

[12] As set forth in the statement of facts, although the AG has initiated a lawsuit to shut down Line 5, that ligation is unresolved.

## B.  PSC'S MEPA ANALYSIS IN GENERAL

Intervenors the Tribes, Michigan Environmental Council, Tip Of The Mitt Watershed Council, National Wildlife Federation, And For Love Of Water argue that the PSC made various errors in connection with its general[13] MEPA analysis.

## 1.  STANDARDS OF REVIEW

We note that in *West Mich Environmental Action Council, Inc v Natural Resources Comm*, 405 Mich 741, 754; 275 NW2d 538 (1979), the Court referred to de novo review in MEPA cases. This was stated in the context of "an environmental protection act case . . . filed in a circuit court." *Id*.; see also *id*. at 749.  In other words, the Court stated that a circuit court must look at the evidence de novo in a MEPA case.  *Id*. at 754.  At issue here is not a separate MEPA action but a MEPA analysis made in the context of a PSC permitting decision.  In *Friends of Crystal River v Kuras Props*, 218 Mich App 457, 470, 472; 554 NW2d 328 (1996), de novo review was applied by a circuit court in the context of a wetlands permitting decision, and this Court approved of the process.  The Court of Appeals, of course, serves a different role from that of a circuit court and is not a finder of fact, and in *Friends of Crystal River*, *id*. at 470, this Court spoke about the circuit court's "finding" regarding the impairment of a natural resource.  Also, in *West Mich Environmental Action Council*, 405 Mich at 754, the Court spoke about a circuit court making "findings of fact" under MEPA.  (Quotation marks and citation omitted.)  The factual circumstances in that case involved a process contemplated by statute, i.e., a circuit court using an administrative tribunal to conduct certain proceedings.  See *id*. at 752-754, former MCL 691.1204, and current MCL 324.1704.  The *West Mich Environmental Action Council* Court stated that "the Legislature specifically addressed the relationship between suits brought under the environmental protection act and administrative proceedings" and concluded that de novo review by the circuit court was required because of the statutory scheme.  *Id*. at 752, 754.

In this case, there was no "suit" under MEPA.  We note, too, that in *Cipri v Bellingham Frozen Foods, Inc*, 235 Mich App 1, 8-9; 596 NW2d 620 (1999), the Court spoke about according deference to a *trial court's findings* in a MEPA case.  Given all the circumstances, including that judicial review of PSC decisions is set forth by way of statute, we conclude that the standards of review as set forth in Part II.A.1. of this opinion are applicable.

## 2.  DISCUSSION

We conclude that the Commission's general MEPA decision was adequately supported by the law and evidence.

MCL 324.1705(2), a provision of MEPA, states:

---

[13] As discussed *infra*, certain intervenors take issue specifically with how the PSC addressed GHGs during its MEPA analysis.  These arguments are addressed in Part II.C. of this opinion.

> In administrative, licensing, or other proceedings, and in any judicial review of such a proceeding, the alleged pollution, impairment, or destruction of the air, water, or other natural resources, or the public trust in these resources, shall be determined, and conduct shall not be authorized or approved that has or is likely to have such an effect if there is a feasible and prudent alternative consistent with the reasonable requirements of the public health, safety, and welfare.

The Tribes, Michigan Environmental Council, Tip of the Mitt Watershed Council, and National Wildlife Federation contend that the Commission erred by failing to consider the risks of oil spills from Line 5 as a whole when making its environmental findings. But the proceedings at issue involved an application for the Replacement Project, and the "conduct" sought to be "authorized or approved" was the Replacement Project. Again, as stated in *United Parcel Serv*, 277 Mich App at 202:

> [This Court] may not read into a statute or rule that which is not within the manifest intention of the Legislature as gathered from the statute or rule itself. Only where the language under review is ambiguous may a court properly go beyond the words of the statute or administrative rule to ascertain the drafter's intent.

The Commission, by looking to the desired "conduct," was following the plain language of MCL 324.1705(2).

Various intervenors take issue with the comparisons the PSC used as possible feasible and prudent alternatives. For example, the Tribes contend that the Commission acted arbitrarily by failing to examine the risk of oils spills from Line 5 as a whole but then, when considering possible alternatives such as rail, taking into account the entire length of needed rail.

As noted, the PSC concluded that there *would* be some environmental impairment as a result of the Replacement Project. See, e.g., *In re Enbridge Energy, Ltd Partnership*, order of the Public Service Commission, entered December 1, 2023 (Case No. U-20763), p 329. Accordingly, under MCL 324.1705(2), the PSC was tasked with determining if there was a feasible and prudent alternative. This could theoretically encompass (1) the status quo, with the dual pipelines in place; (2) replacement of or alternatives for only the Straits segment of Line 5; or (3) alternative transportation methods for the entire line. As set forth in the statement of facts in this opinion, the PSC looked at all of these options. While it could have limited its "alternatives" analysis merely to alternative methods of getting product *through the Straits*, it decided to examine *all* the presented alternatives to the Replacement Project. We acknowledge that it is concerning that the PSC, when discussing rail transport, looked to the effect of rail being used for the entire transport system and at first compared it to just the tunnel project; the Commission mentioned, for example, how many rivers and wetlands a rail system would cross but then did not mention the same statistics for Line 5 as a whole. See, e.g., *id*. at pp 339, 341. However, and importantly, the Commission also relied heavily on the presented evidence that using rail as transport would produce significantly more GHGs, for the same amount of product, than using Line 5 as a whole for transport. *Id*. at 345-346. Accordingly, we conclude that the PSC's MEPA decision is adequately supported by the record.

The Tribes, Michigan Environmental Council, Tip of the Mitt Watershed Council, and National Wildlife Federation contend that the PSC acted inconsistently because it did not consider the risk of oil spills for the entire line yet considered evidence about GHGs regarding the entire line. For Love of Water makes a related argument. The Commission's decision was evidently tied to the fact that the purpose of the Replacement Project was to transport hydrocarbons. It concluded that "its obligations under MEPA extend[] to the products being shipped through the Replacement Project" and, therefore, it considered the impact of GHGs in relation to various alternatives. See *id*. at 51. We conclude that the Commission acted appropriately because it *could* have limited its "comparisons" analysis to just alternatives for the Straits segment of pipeline (such as those presented by the MSCA) but instead decided to look to *all* presented alternatives, and ultimately it reached a decision that was supported by the evidence in the record.

For Love of Water, Environmental Law & Policy Center, and Michigan Climate Action Network contend that the PSC did not apply a proper burden of proof because, once the Commission concluded that there would be some environmental impairment as a result of the Replacement Project, it was Enbridge's burden to demonstrate that there was no feasible and prudent alternative, and Enbridge did not present evidence of the lack of such alternatives. MCL 324.1703(1) states:

> When the plaintiff in the action has made a prima facie showing that the conduct of the defendant has polluted, impaired, or destroyed or is likely to pollute, impair, or destroy the air, water, or other natural resources or the public trust in these resources, the defendant may rebut the prima facie showing by the submission of evidence to the contrary. The defendant may also show, by way of an affirmative defense, that there is no feasible and prudent alternative to defendant's conduct and that his or her conduct is consistent with the promotion of the public health, safety, and welfare in light of the state's paramount concern for the protection of its natural resources from pollution, impairment, or destruction. Except as to the affirmative defense, the principles of burden of proof and weight of the evidence generally applicable in civil actions in the circuit courts apply to actions brought under this part.

The statute speaks to the defendant's opportunity to show the lack of a feasible and prudent alternative, but it does not state that *only* the defendant or petitioner can present evidence about alternatives. The PSC Staff and the MSCA presented possible alternatives, and the PSC also considered the alternatives set forth in the Dynamic Risk report, which, notably, was a report introduced by Environmental Law & Policy Center. In *Ray v Mason Co Drain Comm'r*, 393 Mich 294, 312-313; 224 NW2d 883 (1975), the Michigan Supreme Court stated:

> If the defendant rather than, or in addition to attempting, to rebut plaintiff's case seeks to establish an affirmative defense, then *the judge must set out those facts which led him to conclude 1) that feasible and prudent alternatives do or do not exist and what the claimed alternatives were* and 2) that the defendant's conduct is or is not consistent with the promotion of public health, safety and welfare. [Quotation marks omitted; emphasis added.]

In this case, the PSC explained why the alternatives that were presented were not feasible and prudent in its view. Also, it is important to note that the Straits-specific alternatives presented by the MSCA were *on behalf of Enbridge*. Indeed, the MSCA intervened on Enbridge's behalf and stated that "MSCA . . . will suffer an injury in fact if Enbridge's permit application is denied." A remand is unwarranted because numerous alternatives were in fact presented and considered, even if they did not originate from Enbridge itself.

For Love of Water contends, in a reply brief, that the PSC, in its MEPA analysis, did not consider the public trust. MCL 324.1705(2) refers to "the alleged pollution, impairment, or destruction of the air, water, or other natural resources, or the public trust in these resources[.]" The Commission considered this statutory reference to the "public trust in [the] resources" by way of its overall MEPA review.

The AG contends that the PSC's MEPA analysis was flawed because the Commission limited its consideration of alternatives, such as rail transport. This is not accurate, however. The Commission, in its April 2021 order, ruled that it would consider evidence concerning alternative transportation methods. *In re Enbridge Energy, Ltd Partnership*, order of the Public Service Commission, entered April 21, 2021 (Case No. U-20763), pp 64, 68-69. It stated:

> At this early stage of the proceeding, the Commission is not persuaded that it should prohibit arguments and evidence addressing what the appropriate point of comparison is for any pollution, impairment, or destruction of Michigan's natural resources resulting from the proposed Replacement Project. Such questions on the feasibility and prudence of alternatives—*both in terms of alternative pipeline and non-pipeline shipping arrangements* and alternatives to the products being shipped—are inherently questions of fact well suited to the development of record evidence. However, *while allowing evidence to be considered on this point*, the Commission notes that this is only the beginning of the inquiry, and the Commission must ultimately determine, consistent with its responsibilities under MEPA, whether there is any pollution, impairment, or destruction as a result of the Replacement Project—including in comparison to the possible closure of the dual pipeline segments currently in the Straits if the Notice is enforced; whether any pollution, impairment, or destruction is consistent with the protection of Michigan's natural resources; and whether there are feasible and prudent alternatives to any pollution, impairment, or destruction that is found as a result of the Replacement Project. [*Id*. (emphasis added).]

Intervenors were *allowed* to present evidence of alternatives. Some intervenors presented evidence regarding alternative scenarios. See *In re Enbridge Energy, Ltd Partnership*, order of the Public Service Commission, entered December 1, 2023 (Case No. U-20763), pp 118-126. And, as discussed, the PSC considered alternatives such as rail transport before concluding that there was not a feasible and prudent alternative to the Replacement Project.

Moreover, the Commission stated that some environmental concerns will be addressed by way of permitting decisions by other agencies:

As an initial matter, the Commission agrees with the Staff that several potential environmental impairments resulting from the construction of the Replacement Project fall in the regulatory purview of other state and federal agencies and will be addressed by separate permitting decisions. For example, [certain] witnesses . . . asserted that the discharge of wastewater in the Great Lakes during construction of the tunnel and regular operations of the Replacement Project is likely to affect the Great Lakes' ecosystem. The Staff noted that the NREPA Part 31 permit "establishes parameters for authorized discharge, including quantity and composition." . . . The Commission agrees with the Staff that Enbridge's compliance with these permit requirements should minimize potential environmental impacts from construction and operation of the Replacement Project. [*Id*. at 328.]

Certain intervenors contend that the PSC could not "defer" to another agency as it did in this passage. But the PSC's decision was supported by evidence in the record, such as permit language, indicating that Enbridge would need to comply with particular discharge requirements.

On balance, we find no basis on which to reverse or remand.

## C. PSC'S MEPA ANALYSIS AS SPECIFICALLY APPLIED TO GREENHOUSE-GAS EMISSIONS

Intervenors Environmental Law & Policy Center and Michigan Climate Action Network argue that Commission made various errors with regard to how it analyzed the impact of GHGs in the context of its MEPA decision.

### 1. STANDARDS OF REVIEW

The standards of review are discussed in Part II.B.1.

### 2. DISCUSSION

We conclude that the Environmental Law & Policy Center and the Michigan Climate Action Network have not established entitlement to appellate relief in connection with their arguments about how the PSC evaluated the impact of GHGs.

The Environmental Law & Policy Center and the Michigan Climate Action Network argue that the PSC, in evaluating GHGs in connection with MEPA, failed to properly take into account the expert testimony they presented concerning the following:

[a] standard methodology [that] includes both "direct" GHG emissions from construction and operation of the project [i.e., GHGs from building the tunnel and new pipeline segment] and "indirect" upstream and downstream GHG emissions from extraction, refining, and consuming the oil and gas that would flow through the pipeline.

Their expert witness Peter Erickson testified:

[W]hen compared to a scenario in which the existing Line 5 pipeline no longer operates, construction and operation of the Proposed Project would lead to an increase of about 27 million metric tons CO2e annually in global greenhouse gas emissions from the production and combustion of oil.

Erickson explained further:

In the case of the Proposed Project, the availability of oil pipelines, including Line 5, affects global GHG emissions because pipelines help increase the supply of oil. Evaluation of these dynamics is a typical methodology for analyzing incremental GHG emissions of an energy infrastructure project.

Erickson said that he calculated the 27-million-ton increase by looking at increased costs for oil as a result of rail transport, comparing these to the lower costs for oil if Line 5 were used, and considering " '[l]ong-run elasticities.' " He elaborated:

"Long-run" elasticities are intended to gauge effects over a period of time in which producers and consumers have time to make changes in their equipment or investment decisions, such as the decision of what kind of car to buy or whether or not to drill a new oil field. Over this time period—the next several years—the flexibility of decisions is greater than in the "short run," and hence the effects of a change in price are greater. The long-run elasticities of supply (0.6) and demand (-0.3) that I use here are the same as in my most recent peer-reviewed research.

The Environmental Law & Policy Center and the Michigan Climate Action Network argue that the PSC, in evaluating GHGs, ignored the pricing pressure on supply and demand, simply *assumed* no diminishment in demand, and, therefore, failed to take into account that facilitating the continuation of Line 5 would result in an increase in GHGs.

Alexander Morese, a member of the PSC Staff, stated that the increase in prices resulting from alternative transportation methods "would not be enough to curb current usage" of petroleum products. Morese disputed Erickson's conclusion that a shutdown of Line 5 would result in "reduced demand, and thus reduced GHG emissions." He stated that long-term effects would be unlikely. The PSC, in making its GHGs analysis, cited to transcript pages that included Morese's testimony. *In re Enbridge Energy, Ltd Partnership*, order of the Public Service Commission, entered December 1, 2023 (Case No. U-20763), p 345. Also, it noted, correctly, that "Erickson did not dispute that moving oil by rail will increase GHG emissions" (i.e., by virtue of the transport itself). *Id*. at 346.

The argument by the Environmental Law & Policy Center and the Michigan Climate Action Network is not persuasive because the PSC supported its conclusions regarding GHGs by direct reference to the testimony in evidence. The Environmental Law & Policy Center and the Michigan Climate Action Network contend that the Commission should have placed more emphasis on long-term effects as testified to by Erickson. The PSC did make reference to "short term" and "immediate" effects, see *id*. at 345, without explaining why it should not be focusing on all eventualities. But again, despite the wording the PSC employed, its ultimate conclusions regarding GHGs has support in the cited evidence. In addition, it is important to remember, as the

PSC itself strongly emphasized immediately after discussing GHGs, see *id*. at 346, that the dual pipelines pose a clear environmental threat. Any MEPA analysis needed to take into account that the attempt to shut the dual pipelines down has not yet been successful, and the granting of the permit by the PSC will resolve the problem posed by the dual pipelines.

The Environmental Law & Policy Center and the Michigan Climate Action Network further argue that the PSC violated *Ray*, 393 Mich at 306-307, because it did not "adopt and apply a standard and methodology" for evaluating GHGs. But the Environmental Law & Policy Center and the Michigan Climate Action Network do not indicate under what authority the PSC would be acting in adopting such standards. As already noted, the Commission is a "creature of the Legislature" and has no common-law powers; it "possesses only that authority bestowed upon it by statute." *Union Carbide Corp*, 431 Mich at 146. In the *Ray* case, the Court was speaking about the Legislature, by way of MEPA, leaving it to courts to "develop[] a common law of environmental quality." *Ray*, 393 Mich at 306-307. The bottom line is that the Commission considered the evidence presented in the contested case, which is what it was tasked with doing.

The Environmental Law & Policy Center and the Michigan Climate Action Network also suggest that the PSC violated *Thomas Twp v John Sexton Corp of Mich*, 173 Mich App 507; 434 NW2d 644 (1988), in which this Court stated that MEPA's impairment standard requires a "statewide perspective." In *Thomas Twp*, *id*. at 509-511, this Court reviewed the granting of a permit to drain an artificial lake. This Court stated:

> The [lower] court concluded that draining the lake would violate MEPA, reasoning that although the lake would be considered an abandoned clay pit filled with water if it were located elsewhere, in Saginaw County it was a rare resource.
>
> * * *
>
> This case does not concern the destruction of animal or plant life, nor the loss of a valuable natural resource. The lake is an abandoned clay pit filled with water which is hazardous to people and property. The lake's only significant value is its potential to be a recreational facility. The record indicates that this potential would not be realized even if the lake were not drained. . . .
>
> From a statewide perspective, draining the lake will not constitute the impairment or destruction of a natural resource under MEPA. [*Id*. at 516-517.]

The Commission in the present case considered general environmental impacts and did not run afoul of *Thomas Twp*.

The Environmental Law & Policy Center and the Michigan Climate Action Network also contend that the PSC, in evaluating GHGs, ran afoul of *Nemeth v Abonmarche Dev, Inc*, 457 Mich 16, 31; 576 NW2d 641 (1998), wherein the Court noted that a MEPA review generally requires an evaluation of the environmental situation before the proposed action as compared to the probable environmental situation afterwards. But the Commission did, in fact, evaluate the environmental situation before the proposed action.

Accordingly, we conclude that the GHG-specific arguments raised by the Environmental Law & Policy Center and the Michigan Climate Action Network do not warrant a reversal or remand.

### III. BORKE'S ATTEMPT TO APPEAL

Matthew S. Borke filed an appeal as of right in this case. All appellants in these consolidated appeals were formally recognized as intervenors in the proceedings below, *except* Borke. Borke, in his jurisdictional checklist, cites MCR 7.203(A)(2) and MCL 462.26. MCR 7.203(A)(2) states that this Court

has jurisdiction of an appeal of right filed by an aggrieved party from the following:

* * *

(2) A judgment or order of a court or tribunal from which appeal of right to the Court of Appeals has been established by law or court rule.

MCL 462.26 provides that "*any* common carrier or *other party in interest*, being dissatisfied with any order of the commission . . . fixing any regulations, practices, or services, may within 30 days from the issuance and notice of that order file an appeal as of right in the court of appeals." (Emphasis added.) Borke merely offered *public comments* in the proceedings below; his contributions consisted of two short e-mails complaining generally about Enbridge's honesty and motives and alleging misconduct, sometimes in connection with a project unrelated to the instant case. No supported legal arguments were advanced. "[A]ny . . . *party* in interest," see MCL 462.26 (emphasis added), cannot include each and every person who happened to offer comments, but nothing more, in a contested case. Borke contends in a reply brief that the PSC can permit intervention if someone will bring a unique perspective to a case, but, crucially, he never states that *he* was granted intervention. He also cites MCL 460.6g(4), which is inapposite because it deals with appeals from certain types of rate-setting. And he cites Mich Admin Code, R 792.10413, which speaks of "participation without intervention" in certain proceedings and specifically states that a person participating in this manner "shall not be regarded as a party to the proceeding." See Mich Admin Code, R 792.10413(2). *Hundreds and hundreds* of people, perhaps thousands, offered comments in this case, and this is common for a high-profile case. It is not tenable that each is entitled to an appeal as of right.[14] We decline to consider Borke's arguments.

---

[14] We note that MCR 7.203(F)(1) states, "Except when a motion to dismiss has been filed, the chief judge or another designated judge may, acting alone, dismiss an appeal or original proceeding for lack of jurisdiction." In addition, the Court of Appeals may "enter any judgment or order or grant further or different relief as the case may require[.]" MCR 7.216(A)(7).

## IV. CONCLUSION

The PSC issued a comprehensive and detailed opinion. We find no basis for ordering a reversal or remand. The Commission acted reasonably when one considers its actions and rulings as a whole.

Affirmed.

/s/ Michael J. Kelly
/s/ Anica Letica
/s/ Randy J. Wallace